IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 05-cv-01437 - LTB - CBS

FRANCISCO JUAN LOBATO, individually and as the personal representative of the estate of
Frank Lobato;
ANTHONY LOBATO;
BARBARA LOBATO; and
RAMONA LOBATO,

      Plaintiffs,

v.

RANJAN FORD, JR., individually and as a Police Officer for the City and County of Denver;
JOSHUA HERRICK,  individually and as a Police Officer for the City and County of Denver;
GENE SHARLA, individually and as a Police Officer for the City and County of Denver;
ROBERT SHILLER,  individually and as a Police Officer for the City and County of Denver;
CHARLES KYLE, individually and as a Police Officer for the City and County of Denver;
STEVEN ADDISON, individually and as a Police Officer for the City and County of Denver;
JOHN and JANE DOES, Denver Police Officers whose true names and identities are unknown;
GERALD WHITMAN, Chief of Police of the City and County of Denver; and
THE CITY AND COUNTY OF DENVER, a municipal corporation,

      Defendants.

_____

ORDER
_____

This case is before me on Defendants Steven Addison and Charles Kyle's Motion for

Summary Judgment [Doc # 119].  After consideration of the motion and all related pleadings, as

well as the case file, I grant the motion in part and deny it in part as set forth below.

## I.  Facts

The following facts are undisputed unless otherwise noted.  On July 11, 2004, Defendant

Robert Shiller, Defendant Joshua Herrick, and Jason Huff, all officers with the Denver Police

Department, went to the McDonald's restaurant located at 1350 West Colfax Avenue in response

to a domestic violence call by Cathy Sandoval.  Specifically, Sandoval reported that an individual named Vincent Martinez had beaten her and held her against her will for several hours at the residence they shared located at 1234 West 10th Avenue (the "Residence").

At the McDonald's restaurant, the officers observed physical injuries to Sandoval and determined that Martinez had two outstanding warrants for his arrest.  The warrants were apparently for failure to appear on a citation for public urination and for assault.  The officers also interviewed Sandoval who told them that she had last seen Martinez asleep on the couch in the Residence and that an uncle was also there.  The uncle that Sandoval was referring to was Frank Lobato who had apparently been living at the Residence for one to two weeks prior to July 11, 2004.  Plaintiffs assert that Sandoval further advised the officers at this time that Lobato was not involved in the assault that Martinez had inflicted upon her and that he was in an upstairs bedroom of the Residence.  Defendants have presented evidence, however, that contradicts this assertion.  In any event, it is clear that the responding officers were advised of the possible presence of a potentially innocent party at the Residence.  At this time, Sandoval also gave Shiller her consent to enter the Residence and indicated that she did not have keys to the Residence.

At some point during the officers' investigation into Sandoval's complaint, Addison and Kyle delivered a camera to the McDonald's restaurant to document Sandoval's physical injuries.  Both Addison and Kyle were on duty as sergeants with the Denver Police Department, but Kyle was also acting as lieutenant on that night.  Addison and Kyle left the McDonald's after approximately 10 minutes and did not have any direct communications with Sandoval at this time.

Officers Shiller, Herrick, and Huff went from the McDonald's restaurant to a location near the Residence where they were joined by Defendant Ranjan Ford, Jr.  The four officers discussed

the situation at hand, and Ford was advised that an uncle might also be present at the Residence. The four officers then went to the Residence where they were later joined by Defendant Gene Sharla.

The officers knocked on the doors of the Residence and announced their presence but received no response. The officers heard noises from inside the Residence though one or more witnesses told them that they had seen a man possibly matching Martinez's description jump from a rear second story window. Another witness indicated, however, that she had not seen anyone jump out of a rear second story window of the Residence despite having a clear view of the rear of the Residence at the relevant time. In fact, Martinez had left the Residence by jumping out of the rear second story window shortly after the officers arrived on the scene. At the time, all of the officers were positioned in front of the Residence.

Defendants Sharla, Herrick, and Ford, who were now positioned at the back of the Residence, discussed entering it through an open rear second story window. Before the officers took any action, Shiller, who had remained at the front of the Residence, received an I-Call from Addison, who had returned to the McDonald's restaurant with Kyle. The following exchange took place:

| | |
|---|---|
| Shiller: | ...we were able to get the shade open and there's nobody visible on the first floor. |
| ... | |
| Addison: | Then she doesn't think that he's there if he's not there sleeping on the couch. |
| Shiller: | OK, she doesn't think he'd be upstairs then? |

| Addison: | She said when they left, he was sleeping on the couch downstairs, so you would be able to see him if he was there, and if he's not there, then he's over at Nettie's. |
| --- | --- |
| Shiller: | OK, well, fire's still en route with a ladder.  Do you want us to just check that open window? |
| Addison: | Yeah, go ahead.  There should be an uncle in the house also, and he would be in one of the back bedrooms, so be careful. |
| Shiller: | Clear. |
| ... | |
| Addison: | ... we'll be over there in just a minute.  So, yeah, if there's an uncle in there, be careful. |
| Shiller: | OK, thanks. |

Shiller did not have any further communications with the other officers on the scene regarding Martinez or Lobato's presence in the Residence following this call.

Sometime after this I-Call, Addison and Kyle arrived at the Residence.  Addison and Kyle went to the back of the Residence where they concurred with and authorized Herrick, Ford, and Sharla's entry into the Residence through the open rear second story window using a ladder provided by the Denver Fire Department.  Thereafter, approximately 40 minutes after the officers first arrived at the Residence, Herrick, Ford, and Sharla entered the Residence through the open rear second story window while Addison and Kyle remained outside.

Once inside the Residence, the officers had no further communications with Addison and Kyle.  The officers cleared two of the three upstairs bedrooms and proceeded to the third bedroom where the door was closed.  There, Herrick positioned himself directly across from the closed bedroom door; Sharla positioned himself by or in the bathroom to the right of the closed

bedroom door; and Ford positioned himself by or on the stairwell to the left of the closed bedroom door.  Sharla then reached across and opened the closed bedroom door.  Within a few seconds, at most, from when Sharla opened the door to the bedroom, Ford fired a single shot that struck and killed Lobato.  Following the shooting, Ford's fellow officers heard him say that he thought Lobato had a gun.

Addison and Kyle did not discharge their weapons or otherwise use any force against Lobato during the events which preceded his death.  Addison and Kyle likewise did not have any notice that Ford would fire his weapon at Lobato.

After hearing the gun shot fired by Ford, Addison kicked in the rear door and entered the Residence with Kyle while Shiller entered the Residence by kicking in the front door.  Shiller and Sharla carried Lobato's nude body down the stairs of the Residence, with Shiller supporting Lobato's upper body and Sharla supporting his lower body.  According to Shiller and Sharla, they left Lobato's nude body at the bottom of the stairs by the front door inside the Residence so that emergency response personnel could have easy access to him.  Eyewitnesses, however, claim that they saw police officers place Lobato's nude body on a stretcher outside the Residence where it was viewed by people in the neighborhood.

On August 5, 2005, the Manager of Safety for the City and County of Denver issued an order suspending Ford for 90 days based on his conclusions that Ford's actions on July 11, 2004 violated the Denver Police Department's Use of Force Policy and that Ford's assessment of the threat Lobato posed on that date was not objectively reasonable under the circumstances.  Ford's suspension was subsequently reduced to 50 days as a result of a settlement agreement reached prior to the scheduled administrative appeal hearing.  No other police officers were disciplined for

their involvement in the events that occurred on July 11, 2004.

## II.  Standard for Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial.  *Celotex*, 477 U.S.  at 323;  *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.  *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves."  *Celotex*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial.  *Celotex*, 477 U.S. at 323.  The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a

preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares*, 971 F.2d at 494.

### III.  Analysis

In their First Amended Complaint, Plaintiffs assert claims against Addison and Kyle pursuant to 42 U.S.C. §§ 1983 & 1985.  Although it is somewhat unclear from Plaintiffs' First Amended Complaint, Plaintiffs' response to Addison and Kyle's motion for summary judgment clarifies that their Section 1983 claim against these Defendants is predicated on their authorization of a purported unlawful search; their authorization of the chain of events that led to the alleged use of excessive force; and their failure to prevent the use of such force, all in violation of Lobato's Fourth Amendment rights.  *See also Sacremento v. Lewis,* 523 U.S. 833, 842-3 (1998) (Because alleged unlawful search and use of excessive force are specifically covered by the Fourth Amendment, substantive due process standards do not apply).  Plaintiffs' Section 1983 claim against Addison and Kyle is also predicated on their alleged involvement in displaying Lobato's nude body in public view following the fatal shooting and their failure to prevent such a public display, both in violation of Lobato's right to privacy.  Plaintiffs' response further clarifies that their Section 1985 claim against these Defendants is predicated on their roles in purported conspiracies to unlawfully enter and search the Residence; to cover-up what occurred following this unlawful entry and thereby deprive Plaintiffs of their right of access to the courts; and to display Lobato's nude dead body in public view and thereby deprive him of his right to privacy.

By the motion, Addison and Kyle argue that they cannot be held liable on Plaintiffs' Section 1983 claim because, at most, the evidence establishes negligence of their part and because they are entitled to qualified immunity.  Addison and Kyle further argue that there is insufficient evidence to support Plaintiffs' conspiracy claims.

**A. The Scienter Requirement of Section 1983**

Liability under Section 1983 cannot be predicated on negligence.  *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir. 1992), *cert. denied Woodard v. Seghetti,* 509 U.S. 923 (1993).  Rather, Section 1983 liability must be predicated on a deliberate deprivation of constitutional rights by the defendant.  *Id.*  Reckless intent may be sufficient to establish a violation of Section 1983.  *Medina v. City & County of Denver,* 960 F.2d 1493, 1496 (10th Cir. 1992).  "Reckless intent is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences."  *Id.*

Addison and Kyle argue that Plaintiffs cannot satisfy the scienter requirement of Section 1983 because they cannot establish recklessness or deliberate indifference on their part.  In particular, Defendants emphasize numerous instances in which Plaintiffs' experts have opined that the actions of these Defendants were negligent.  Addison and Kyle acknowledge, however, that Plaintiffs' experts are not permitted to make legal conclusions.  *See United States v. Jensen,* 608 F.2d 1349, 1356 (10th Cir. 1979) ("... an expert witness cannot state legal conclusions by applying law to the facts .... or [usurp] the province of the jury by telling it what result should be reached").  Thus, I accord no weight to Plaintiffs' experts' conclusions suggesting that Addison

and Kyle were merely negligent.

The evidence is indeed slim. But reviewing all the evidence submitted by the parties in the light most favorable to Plaintiffs, I conclude that there is sufficient evidence from which a jury could conclude that Addison and Kyle engaged in conduct that rose to the level of recklessness or deliberate indifference regarding Lobato's Fourth Amendment right to be free from an unreasonable search. In particular, it is clear that Addison and Kyle knew that Lobato, a non-suspect, was likely to be present in the Residence and had reason to question whether Martinez was also at the Residence based on statements from eyewitnesses and Sandoval. Nevertheless, Addison and Kyle authorized the other officers' entry into the Residence via the second floor window under stealth and thereby subjected Lobato to a risk of harm that was arguably unwarranted under the circumstances. Accordingly, I conclude that Plaintiffs have stated a claim under Section 1983 against Addison and Kyle unless the doctrine of qualified immunity is applicable.

## B. The Doctrine of Qualified Immunity

The doctrine of qualified immunity shields governmental officials performing discretionary functions from liability for civil damages provided that their conduct does not violate clearly established constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Once a defendant asserts the defense of qualified immunity, the plaintiff must establish that (1) the defendant's actions violated a constitutional or statutory right; and (2) the law was clearly established such that a reasonable person in the defendant's position would have known that their conduct violated the law. *Garrett v. Stratman,* 254 F.3d 946, 951 (10th Cir. 2001).

The threshold question is whether, taken in the light most favorable to the party asserting

the injury, the facts alleged show that the defendant's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  If, and only if, the violation of a constitutional right can be established under such a view of the facts, the next sequential step is to determine whether the right was clearly established.  *Id.*

I will now analyze sequentially, as I must, whether Plaintiffs can meet the two-part test with respect to Addison and Kyle's involvement in the events in question.

### 1. The Search of Lobato's Bedroom

Addison and Kyle did not personally participate in the search of Lobato's bedroom. Accordingly, Addison and Kyle's liability for the search of Lobato's bedroom must be predicated on their status as supervisors of the officers who conducted this search.

"Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights." *Serna v. Colo. Dept. of Corrections,* 455 F.3d 1146, 1151 (10th Cir. 2006). The plaintiff must therefore establish " a deliberate, intentional act by the supervisor to violate constitutional rights." *Jenkins v. Wood,* 81 F.3d 988, 994-5 (10th Cir. 1996) (quoting *Woodward*, 977 F.2d at 1399).  To establish liability under Section 1983 against a supervisor for the acts of his subordinates then, a plaintiff must show (1) a constitutional violation by the supervisor's subordinates; and (2) an affirmative link between the supervisor and the constitutional violation, "namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." *Serna,* 455 F.3d at 1151.

To defeat Addison and Kyle's motion for summary judgment on their Section 1983 claim based on an unlawful search of Lobato's bedroom, Plaintiffs must first show a genuine issue of material fact as to whether Ford and Herrick violated Lobato's Fourth Amendment rights by this

search.  (By separate order I granted Sharla's summary judgment motion on this claim.)  This requires a preliminary determination of whether the officers' conduct in opening the door to Lobato's bedroom without prior notice as alleged by Plaintiffs and firing a shot into this room constitutes a "search" for purposes of the Fourth Amendment.

A search under the Fourth Amendment "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).  Whether an individual has constitutionally protected reasonable expectation of privacy in a place is determined by two factors: "(1) whether the individual has manifested a subjective expectation of privacy in the object or place to be searched and (2) whether that expectation is one that society is prepared to recognize as reasonable."  *Reeves v. Churchich,* 484 F.3d 1244, 1254 (10th Cir. 2007).  "[T]he burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation."  *United States v. Cavely,* 318 F.3d 987, 994 (10th Cir. 2003).

By closing the door to his bedroom, Lobato manifested a subjective expectation of privacy in his bedroom.  Further, "[i]t is well-settled that an individual has a reasonable expectation of privacy in the interior of one's home."  *Reeves,* 484 F.3d at 1254.  Under these circumstances, it is readily apparent that Lobato had a reasonable expectation of privacy in the room where he was staying.  The next question then is whether Ford and Herrick infringed on that expectation by opening the door to Lobato's bedroom and firing a shot into it.  This question must be answered in the affirmative based both on the physical intrusion into this room by the bullet fired from Ford's weapon as well as the officers' viewing of this room in a manner not available to members of the public.  *Compare United States v.  Taylor,* 90 F.3d 903, 908 (4th Cir. 1996) (law

enforcement officers did not engage in search under the Fourth Amendment by looking through picture window adjacent to front door as anyone at the front entranceway of their home could have done). The officers' therefore conducted a search of Lobato's bedroom under the Fourth Amendment. I must therefore proceed with an analysis of whether this search was in violation of Lobato's rights.

Although searches and seizures inside a home without a warrant are presumptively unreasonable, "one 'jealously and carefully drawn' exception recognizes the validity of searches with the voluntary consent of an individual possessing authority," including a fellow occupant who shares common authority over property when the other occupant is absent. *Georgia v. Randolph,* 547 U.S. 103, 109 (2006) (citations omitted).

Here, Addison and Kyle argue that the warrantless search of the Residence was lawful based on Sandoval's undisputed consent to the police officers' entry into the Residence. Plaintiffs argue, however, that the officers' entry into the Residence nonetheless violated Lobato's Fourth Amendment rights because as a houseguest or co-inhabitant of the Residence he had a legitimate expectation of privacy in his bedroom that Sandoval could not waive. In other words, Plaintiffs argue that Sandoval did not have authority to consent to a search of Lobato's bedroom.

In *U.S. v.Rith,* 164 F.3d 1323, 1329 (10 th Cir. 1999), the Tenth Circuit held that a third party has the authority to consent to a search of property if that third party has either "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." "Control for most purposes over property is a normative inquiry dependent on whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." *Id.* at 1330. Relationships which give rise

to a presumption of control include that of parent-child and husband-wife but not that of simple

co-tenants.  *Id.*  Accordingly, no presumption of control arises in this case based on Lobato's

status as a houseguest or co-inhabitant of the Residence.  In order to establish that Sandoval had

the authority to consent to the search of the bedroom where Lobato was staying then, Addison

and Kyle must show that Sandoval had mutual use of the bedroom by virtue of joint access.

"Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires

findings by a court that the third party entered the premises or room at will, without the consent

of the subject of the search."  *Id.* at 1329-30.  Here, Sandoval has given the following deposition

testimony about her use of the bedroom where Lobato was staying:

> Q: Now, as I understand it, Mr. Lobato also had a small television in his bedroom.
>
> A: Right.
>
> Q: Did he use that television at times?
>
> A: I would assume.  I don't know.  I never invaded his space.
>
> ...
>
> Q: Did he share the room with anybody even though they didn't stay there?  In other words, did your kids have things there in his room?  Did you have things in that room?
>
> A: Yes.
>
> Q: What things did you have in that room?
>
> A: I think just clothes were in the room for the kids and stuff.

This testimony suggests that Sandoval may have continued to make some use of Lobato's

bedroom but did not come and go freely from it.  With no other evidence currently before me

regarding Sandoval's use of this bedroom, I am unable to make the requisite Rule 56 findings to

support a conclusion that she had the authority to consent to the search of this bedroom notwithstanding her status as a named lessee of the Residence.

Even if Sandoval did not have actual authority to consent to the search of Lobato's bedroom, she may have had apparent authority to do so if the officers reasonably, but erroneously, believed that she had actual authority to consent. *U.S. v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007). The apparent authority inquiry is an objective one requiring a determination of whether "the facts available to the officer at the moment ... warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises." *Id.* (*quoting Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990)). The same standards set forth in *Rith* regarding actual authority are applicable to this inquiry such that "a third party has apparent authority if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" *Id.* (*quoting Rith,* 164 F.3d at 1329).

Arguably, Sandoval's undisputed status as an inhabitant of the Residence led the officers to reasonably believe that she satisfied the *Rith* standards. However, "where an officer is presented with ambiguous facts relating to authority, he or she has a duty to investigate further before relying on the consent." *Cos*, 498 F.3d at 1128 (*quoting U.S. v. Kimoana,* 383 F.3d 1215, 1222 (10th Cir. 2004). Here, the officers were advised of Lobato's presence at the Residence but apparently made no effort to determine his status with respect to the Residence, or any part of it, or whether his Fourth Amendment rights would be implicated by a search of it. Under these circumstances, and with no briefing on the issue of apparent authority by any of the parties, I am unable to conclude that Sandoval had apparent authority to consent to the search of Lobato's bedroom as a matter of law.

Accordingly, I conclude that Plaintiffs have satisfied their burden of showing a genuine issue of material fact as to whether Ford and Herrick violated Lobato's Fourth Amendment rights by searching his bedroom. This result is consistent with the authority that Addison and Kyle have cited in support of their assertion that there was no illegal entry into Lobato's bedroom. First, Addison and Kyle cite *Georgia v. Randolph,* 547 U.S. 103 (2006), for the proposition that the officers were not required to actively solicit Lobato's permission to enter his bedroom when Sandoval, a co-tenant, had already given her consent. The question before me on summary judgment, however, is whether Sandoval had the authority to give such consent based on her mutual use of this particular room by virtue of her joint access to it. *Rith,* 164 F.3d at 1329. *See also United States v. Matlock,* 425 U.S. 164, 171 n. 7 (1974) (third-party consent to a search is justified based on mutual use of the property by persons generally having joint access or control for most purposes).

Next, Addison and Kyle cite *United States v. Trotter,* 483 F.3d 694 (10th Cir. 2007) for the proposition that permission by Sandoval, as lessee, to search the Residence was fully effective against Lobato despite his concurrent Fourth Amendment interests. Unlike the present case, however, *Trotter* involved the search of a storage unit as opposed to a home. This distinction is significant because "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Minnesota v. Carter,* 525 U.S. 83, 89 (1998) (KENNEDY, J., concurring). *See also Cos,* 498 F.3d at 1128 (distinguishing *Trotter* largely on the basis that it did not involve the search of a home). In addition, the Tenth Circuit based its conclusion in *Trotter* that there was valid third-party consent to the search of a storage unit both on the consenting party's status as a lessee of the unit and "his active participation in renting and

-15-

using the facility." *Trotter*, 483 F.3d at 699.  Here, there are insufficient undisputed facts before me to support a finding that Sandoval made active use of Lobato's bedroom, and Addison and Kyle therefore cannot establish the criteria relied on by the Tenth Circuit in *Trotter* for valid third-party consent to a search.

In conclusion then, Addison and Kyle are not entitled to summary judgment on the basis that their subordinate officers did not conduct an illegal search of Lobato's bedroom as a matter of law.  Again, the evidence is slim but sufficient to withstand summary judgment.  I must therefore analyze whether Plaintiffs can demonstrate an affirmative link between Addison and Kyle and this search.

The first element of an affirmative link is that Addison and Kyle must have actively participated or acquiesced in the constitutional violation.  *Serna,* 455 F.3d at 1151 (quoting *Holland v.Harrington,* 268 F.3d 1179, 1187 (10th Cir. 2001)).  *See also Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir. 1990) ("Plaintiffs must show that a supervisory defendant, expressly or otherwise, authorized, supervised, or participated in conduct which caused the constitutional deprivation.").  In this regard, it is undisputed that both Addison and Kyle were on the scene at the Residence when Ford, Herrick, and Sharla entered the Residence through the open second story window and that they authorized this course of action.  Although there is no evidence that Addison and Kyle specifically authorized the officers' search of Lobato's bedroom, there is likewise no evidence that Addison and Kyle imposed any limitations on the officers' search of the Residence or raised any concerns regarding Lobato's Fourth Amendment rights.  I therefore conclude that Plaintiffs can demonstrate that Addison and Kyle authorized or acquiesced in an illegal search of Lobato's bedroom.

The next element for the requisite affirmative link for supervisory liability focuses on the supervisor's state of mind.  *Serna,* 455 F.3d at 1151.  Specifically, "a plaintiff must establish that the supervisor acted knowingly or with "deliberate indifference" that a constitutional violation would occur."  *Id.*  This element of supervisory liability is closely related to the scienter requirement discussed above though it is unclear if proof of recklessness is also sufficient in this context.  Nevertheless, recklessness "requires proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk, " *Woodward,* 977 F.2d at 13399 n. 11, while deliberate indifference "requires that the official 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference'."  *Serna,* 455 F.3d at 1154-5.  Given the similarity in the definitions of these terms, it makes little difference which one is utilized for present purposes.

There is clear evidence that both Addison and Kyle were aware of the presence of Lobato, a non-suspect, in a bedroom of the Residence.  It follows that there is a factual question as to whether Addison and Kyle were likewise aware of the fact that Lobato was living at the Residence or that his Fourth Amendment rights may also be implicated by the officers' search of the Residence that precludes a determination that these Defendants lacked the requisite state of mind to impose supervisory liability on them for the search of Lobato's bedroom.  Accordingly, Addison and Kyle's argument that Plaintiffs cannot establish that they possessed the requisite state of mind to subject them to liability under Section 1983 for the search of Lobato's bedroom must fail.  It follows that Addison and Kyle are not entitled to summary judgment on the basis Plaintiffs cannot demonstrate an affirmative link between them and the officers' conduct in searching Lobato's bedroom.

Having concluded that Addison and Kyle may be liable for an illegal search of Lobato's bedroom, I must next determine whether the law was clearly established at the time such that a reasonable person in their position would have known that their conduct violated the law. Whether a particular constitutional right is clearly established at the time of the defendant's actions presents a "purely legal question," *Garrett*, 254 F.3d at 951 (*quoting Siegert v. Gilley*, 500 U.S. 26, 232 (1991), that must be analyzed in light of the specific context of the case, *Saucier*, 533 U.S. at 201.  "Ordinarily for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992).  "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity."  *Cruz v. City of Laramie, Wyo.,* 239 F.3d 1183, 1187 (10th Cir. 2001).

As for the legality of the search itself, *U.S. v. Rith*, is a Tenth Circuit case decided well before the events at issue here.  Further, the test enunciated in *Rith* for valid third party consent to a search was predicated on principles set forth in *U.S. v. Matlock,* 415 U.S. at 171 n.7 (1974) and *U.S. v. McAlpine,* 919 F. 1461, 1463 (10th Cir. 1990).  Although *U.S. v. Cos* was decided after Lobato's shooting, its analysis of apparent authority to consent to a search was largely derived from *Illinois v. Rodriguez,* 497 U.S. 177 (1990) and *Rith*.  I therefore conclude that the law was clearly established such that a reasonable person in the position of Addison and Kyle would have known that the officers' conduct in searching Lobato's bedroom was in violation of his Fourth Amendment rights.

As to Addison and Kyle's liability as supervisors of the officers who searched Lobato's bedroom, the analysis above relied heavily on the Tenth Circuit case of *Serna v. Colo. Dept. of Corrections,* which was decided after the events at issue in this case. Nonetheless, *Serna* relied on prior Tenth Circuit precedent in establishing a framework for analyzing supervisory liability. *Serna*, 455 F.3d at 1151-2. I therefore likewise conclude that the law was clearly established that such that a reasonable person in the position of Addison and Kyle would have known that their conduct in supervising the officers who searched Lobato's bedroom was unlawful. Accordingly, Addison and Kyle are not entitled to summary judgment on Plaintiffs' Section 1983 claim based on an alleged unlawful search of Lobato's bedroom under the defense of qualified immunity.

### 2. The Shooting of Lobato

Since the relevant portion of Plaintiffs' response brief refers to Defendants Herrick and Sharla, it is unclear if Plaintiffs are claiming that Addison and Kyle are liable under Section 1983 for the shooting of Lobato based on their failure to intervene to prevent this shooting. In any event, the undisputed facts clearly establish that Addison and Kyle, who were outside of the Residence at the time Lobato was shot, did not have an opportunity to prevent this shooting and therefore cannot be held liable for their failure to intervene. *See Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1433 (10th Cir. 1984), *vacated on other grounds,* 474 U.S. 805 (1985) (a police officer who does not prevent a fellow officer's use of excessive force may be liable under Section 1983 if he had the opportunity to intervene but failed to do so). *See also Ting v. United States,* 927 F.2d 1504, 1511-12 (9th Cir. 1991) (non-shooting law enforcement agents could not be held liable to plaintiff where there was no evidence that they knew that the shooting agent would take such action and where the agents were physically incapable of preventing the shooting).

Likewise, Plaintiffs seemingly argue that Addison and Kyle can be held liable for their participation in the chain of events that led to the shooting of Lobato under *Strachan v. City of Federal Heights,* 837 F. Supp, 1036 (D. Colo. 1993).  Addison and Kyle did not, however, directly participate in any of the events that preceded the shooting of Lobato and their liability must therefore be predicated on their status as supervisors of the officers who did. Accordingly, Plaintiffs must again show (1) a constitutional violation by Addison and Kyle's subordinate officers in this case Ford; and (2) an affirmative link between Addison and Kyle and the constitutional violation.  *Serna,* 455 F.3d at 1151. (By separate order I have granted Officers Herrick and Sharla's summary judgment motion on this claim.)

Claims of excessive force must be analyzed under the Fourth Amendment's standard of objective reasonableness.  *Graham v. Connor,* 490 U.S. 386, 388 (1989).  This standard requires a balancing of the individual's Fourth Amendment rights against the countervailing governmental interests at stake and requires careful attention to particular facts and circumstances, including the severity of the crime at issue, the nature of the threat presented to the officers or others, and the degree of resistance by the individual.  *Id.* at 396.  In cases involving deadly force, the use of such force is justified under the Fourth Amendment if a reasonable police officer would have had probable cause to believe that there was a threat of serious physical harm to the officer or to others.  *Sevier v. City of Lawrence,* 60 F.3d 695, 699 (10th Cir. 1995).

Consideration of these factors and the evidence submitted in connection with the summary judgment motions demonstrate that there is clearly a triable issue as to whether Ford subjected Lobato to excessive force in violation of his Fourth Amendment rights.  In particular, there are material disputes regarding precisely what transpired when the officers opened the door to

Lobato's bedroom that preclude a determination at this stage that Ford's actions in shooting Lobato were objectively reasonable based on his purported belief that Lobato was armed and confrontational.  Among other things, there is a genuine dispute as to whether Lobato had any object in his hands, said anything, or made any movement when the door was opened.  Addison and Kyle are therefore not entitled to summary judgment on the basis that their subordinate officer did not utilize excessive force against Lobato as a matter of law.  I must therefore analyze whether Plaintiffs can demonstrate an affirmative link between Addison and Kyle and this use of force.

The first element of an affirmative link is that Addison and Kyle must have actively participated or acquiesced in the constitutional violation.  *Serna,* 455 F.3d at 1151 (quoting *Holland v.Harrington,* 268 F.3d 1179, 1187 (10th Cir. 2001)).  *See also Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir. 1990) ("Plaintiffs must show that a supervisory defendant, expressly or otherwise, authorized, supervised, or participated in conduct which caused the constitutional deprivation.").  In this regard, it is undisputed that both Addison and Kyle were on the scene at the Residence when Ford, Herrick, and Sharla entered the Residence through the open second story window under stealth and that they authorized this course of action.  Although there is no evidence that Addison and Kyle specifically authorized the use of force against Lobato once inside the Residence, there is likewise no evidence that Addison and Kyle warned the entering officers of Lobato's presence at the Residence or of the need to exercise caution as a result.  I therefore conclude that Plaintiffs can demonstrate that, at a minimum, Addison and Kyle implicitly acquiesced in the use of force against Lobato.

The next element for the requisite affirmative link for supervisory liability focuses on the

-21-

supervisor's state of mind. *Serna,* 455 F.3d at 1151.  Again, this requires evidence that Addison

and Kyle were aware both of facts from which the inference could be drawn that a substantial risk

of serious harm to Lobato existed and that they drew that inference. *Serna*, 455 F.3d at 1154-5.

In this regard, there is clear evidence that both Addison and Kyle were aware of the presence of

Lobato, a non-suspect, in a bedroom of the Residence and of the fact that Martinez may well have

left the Residence.  Further, Addison's repeated admonitions to Shiller to be careful as a result of

Lobato's presence demonstrates an appreciation of the risk to Lobato as a result of the officers'

entry into and search of the Residence.  Under these circumstances, Addison and Kyle's argument

that Plaintiffs cannot establish that they possessed the requisite state of mind to subject them to

liability under Section 1983 for the use of excessive force against Lobato must fail.  It follows that

Addison and Kyle are not entitled to judgment as a matter of law on Plaintiffs' Section 1983 claim

based on the use of excessive force against Lobato

Having concluded that Addison and Kyle may be liable for the use of excessive force

against Lobato, I must next determine whether the law was clearly established at the time such

that reasonable persons in the position of Addison and Kyle would have known that their conduct

was unlawful.  Again, this prong of the test for qualified immunity ordinarily requires a Supreme

Court or Tenth Circuit decision on point or, alternatively, a weight of supporting authority from

other courts.

As for the legality of the use of deadly force against Lobato, the law in the Tenth Circuit

at the time clearly established that the use of such force was justified only if a reasonable officer

would have had probable cause to believe that there was a serious threat of physical harm to the

officer or to others. *Sevier,* 60 F.3d at 699.  Thus, accepting the facts in the light most favorable

to Plaintiffs, I conclude that the law was clearly established that Ford's conduct in fatally shooting

an unarmed, non-threatening person who was not a suspect in any crime was unlawful and that

the unlawfulness of this conduct would have been known to reasonable persons in the position of

Addison and Kyle.  Additionally, I have already concluded that Tenth Circuit precedent clearly

established the standards for supervisory liability such that reasonable persons in the position of

Addison and Kyle would have known that their conduct in supervising Ford was unlawful.

Accordingly, Addison and Kyle are not entitled to summary judgment on Plaintiffs' Section 1983

claim based on an alleged use of excessive force against Lobato under the defense of qualified

immunity.

### 3.  The Handling of Lobato's body

Although not explicitly mentioned in the Constitution, the Supreme Court has repeatedly

recognized that there is a constitutional right to privacy.  *See e.g. Carey v. Population Serv., Int'l,*

431 U.S. 678, 684 (1977).  Plaintiffs assert that Lobato's right to privacy was violated by

Addison and Kyle's post-shooting conduct in failing to cover Lobato's nude body and in placing

his nude body where it could be viewed by the public, as well as by their failure to intervene to

prevent the display of Lobato's nude body.

In support of their right to privacy claim, Plaintiffs baldly assert "[t]hat a person has a

clearly established constitutional privacy right in having their unclothed body seized and placed in

the open view of the entire neighborhood is so fundamental that it needs little citation to

authority."  Response, p. 28.  Indeed, Plaintiffs cite but one Tenth Circuit case involving a right to

privacy claim based on the viewing of a nude or semi-nude body.  Therein, the Tenth Circuit

merely stated:

> Although the frequency of such practices is important, ... the plaintiff's statement that male inmates were subject to a "certain amount of viewing" by female guards does not necessarily fall short of a cognizable constitutional claim. The district court thus erred in dismissing the entire action as frivolous.

*Cumby v. Meachum,* 684 F.2d 712, 714 (10th Cir. 1982) (*per curium*). Nonetheless, Plaintiffs argue that Addison and Kyle's conduct with respect to the handling of Lobato's body following the shooting was so egregious that the unlawfulness of this conduct was readily apparent despite the lack of authority on point. I disagree. Furthermore, even if I was to conclude that there is a triable issue as to whether the officers' conduct in failing to cover Lobato's body and in placing it where it could be viewed by the public violated Lobato's right to privacy, Plaintiffs are wholly unable to satisfy the second prong of the qualified immunity test; that is, that the law was clearly established such that reasonable persons in Addison and Kyle's position would have known that their conduct violated Lobato's right to privacy.

Plaintiffs attempt to circumvent the lack of authority directly on point by reliance on *Hope v. Pelzer,* 536 U.S. 730, 741 (2002), wherein the Supreme Court recognized that governmental officials may still be on notice that their conduct violates the law in novel factual circumstances. In any event, however, analysis of whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 202. Here, Plaintiffs are unable to identify any authority recognizing a violation of privacy right under facts even remotely similar to those present here. I therefore conclude that the law regarding the right to privacy was not sufficiently established such that a reasonable person in the position of these Defendants would have known that their conduct violated this right. Accordingly, I further find and conclude that Plaintiffs' Section 1983 claim against Addison and

Kyle based their alleged violation of Lobato's right to privacy is precluded by the doctrine of qualified immunity.

## C. Plaintiffs' Section 1985 Conspiracy Claims

Plaintiffs' response to Addison and Kyle's motion for summary judgment clarifies that their claims against these Defendants under 42 U.S.C. § 1985 are predicated on three distinct alleged conspiracies: (1) Addison and Kyle's alleged agreement with other officers to engage in conduct in entering and searching the Residence that was in reckless disregard or with deliberate indifference to Lobato's rights; (2) Addison and Kyle's alleged agreement with other officers to cover-up the unlawful shooting by manufacturing a defense based on a false representation that Lobato was holding a shiny can in his hand when the officers opened the door to his bedroom; and (3) Addison and Kyle's alleged agreement with other officers to display Lobato's nude body in public view. Addison and Kyle argue that Plaintiffs' claims under Section 1985 against these Defendants must fail with respect to each of these alleged conspiracies. I agree.

In order to prevail on a claim under Section 1985(3), Plaintiffs must prove the following elements: "(1) a conspiracy; (2) the deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993). It is questionable at best that the evidence, direct and circumstantial, viewed in the light most favorable to Plaintiffs shows genuine issues of material fact as to existence of any conspiracy. But additionally, Plaintiffs must prove that the alleged conspiracies were driven by racial or class-based discriminatory animus. *Id.*

Addison and Kyle argue, in part, that Plaintiff's Section 1985 conspiracy claims must fail because there is no evidence of racial or class-based discriminatory animus. To establish that the

requisite discriminatory animus, Plaintiffs rely on the following facts: (1) Lobato was a member of

a minority group that has historically suffered from invidious discrimination; (2) Ford and the

other officers knew that Lobato and all other persons in the Residence were Chicano/Mexican-

Americans; and (3) the Denver Police Department's Early Identification and Intervention System

("EIIS") identified an excessive number of use of force incidents against minorities by Ford.  The

first two facts cited by Plaintiffs are insufficient in and of themselves to establish discriminatory

animus on the part of Defendants.  Thus, the EIIS reports must provide sufficient evidence of

such animus in order for Plaintiffs to defeat Addison and Kyle's motion for summary judgment on

their Section 1985(3) conspiracy claims.

The EIIS reports do not relate in any way to either Addison or Kyle.  Plaintiffs

nonetheless assert that these reports are sufficient to establish the requisite discriminatory animus

because they demonstrate an excessive number of use of force incidents against minorities by

Ford, a co-conspirator.  A review of the related documents, however, fails to support this

assertion.  Instead, these documents merely reflect that Ford was involved in a total of 3 use of

force incidents against persons of all races during the applicable time period and was therefore

automatically subject to review.  This evidence then does not support a conclusion that Ford was

involved in an excessive number of use of force incidents against minorities.  Moreover, notably

absent from the records relating to the use of force by Ford is evidence that any of these prior

incidents involved people in the same ethnic minority or class as Plaintiffs or Lobato.  Under these

circumstances, I conclude that Plaintiffs are unable to establish that the alleged conspiracies

between Addison, Kyle, and other officers were driven by racial or class-based animus.  Plaintiffs'

claims against Addison and Kyle under Section 1985 must therefore fail as a matter of law, and I

need not consider the additional arguments that Addison and Kyle have made in support of summary judgment on Plaintiffs' Section 1985 claims.

Although Addison and Kyle also argue that they are entitled to summary judgment on a claim for conspiracy under Section 1983, Plaintiffs have not made such a claim. Rather, Plaintiffs merely cite authority regarding conspiracies under Section 1983 to support their conspiracy claims under Section 1985 but that implicates a different standard.

**D. Plaintiffs' Claim Under 42 U.S.C. § 1986**

Curiously, although their First Amended Complaint only states claims against Addison and Kyle pursuant to Sections 1983 & 1985, Plaintiffs now assert that these Defendants are also liable to them under 42 U.S.C. § 1986 as a result of their alleged failure to intervene to prevent the conspiracies that purportedly occurred in violation of Section 1985. Plaintiffs cannot, however, inject a new claim into this case by way of a response to a summary judgment. Since I have already rejected Plaintiffs' argument that there is sufficient evidence to go to trial on a conspiracy claim under Section 1985, there is no basis for this claim in any event. *See e.g. Grimes v. Smith,* 776 F.2d 1359 (7th Cir. 1985) (claim under Section 1986 must be supported by valid claim under Section 1985).

**E. Plaintiffs' Claim for Deprivation of the Familial Right of Association**

Finally, Plaintiffs concede that *Trujillo v. Board of County Comm'ers,* 768 F.2d 1186 (10th Cir. 1985), as the controlling law of the Tenth Circuit, precludes any claim for deprivation of the familial right of association encompassed in either their Section 1983 or conspiracy claims.

For the reasons set forth above, IT IS ORDERED that

-27-

1.   Defendants Steven Addison and Charles Kyle's Motion for Summary Judgment [Doc # 119] is GRANTED IN PART and DENIED IN PART;

2.   Plaintiffs' claims against Defendants Addison and Kyle under 42 U.S.C. § 1983 based on violation of the right to privacy and deprivation of the familial right of association are hereby DISMISSED WITH PREJUDICE;

3.   Defendants Addison and Kyle's Motion for Summary Judgment on Plaintiffs' claims under 42 U.S.C. § 1983 based on an illegal search and the use of excessive force is DENIED; and

4.   Plaintiffs' claims against Defendants Steven Addison and Charles Kyle under 42 U.S.C. § 1985 are hereby DISMISSED WITH PREJUDICE.


Dated: October ___31___, 2007 in Denver, Colorado.

BY THE COURT:


   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE