IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 05-cv-01437 - LTB - CBS

FRANCISCO JUAN LOBATO, individually and as the personal representative of the estate of
Frank Lobato;
ANTHONY LOBATO;
BARBARA LOBATO; and
RAMONA LOBATO,

       Plaintiffs,

v.

RANJAN FORD, JR., individually and as a Police Officer for the City and County of Denver;
JOSHUA HERRICK,  individually and as a Police Officer for the City and County of Denver;
GENE SHARLA, individually and as a Police Officer for the City and County of Denver;
ROBERT SHILLER,  individually and as a Police Officer for the City and County of Denver;
CHARLES KYLE, individually and as a Police Officer for the City and County of Denver;
STEVEN ADDISON, individually and as a Police Officer for the City and County of Denver;
JOHN and JANE DOES, Denver Police Officers whose true names and identities are unknown;
GERALD WHITMAN, Chief of Police of the City and County of Denver; and
THE CITY AND COUNTY OF DENVER, a municipal corporation,

       Defendants.

_____

## ORDER
_____

       This case is before me on Defendants City and County of Denver (the "City") and Gerald

R. Whitman's Motion for Summary Judgment [Doc # 125].  After consideration of the motion

and all related pleadings, as well as the case file, I grant the motion in part and deny it in part as

set forth below.

## I.  Facts

       The parties have devoted approximately 100 combined pages of their briefs to a discussion

of the facts in this case.  Many of these facts are largely irrelevant to the issues before me.

Among other things, Defendants set forth in great detail written policies of the Denver Police Department (the "Department").  Plaintiffs, for the most part, do not dispute that these policies exist on paper but instead claim that they do not reflect the actual policies and customs of the Department.  I therefore need only set forth a substantially abbreviated recitation of the undisputed facts in this case to aid in the analysis of Defendants' summary judgment motion.

The following facts are undisputed and refer to the timeframe of the police operation underlying Plaintiffs' claims unless otherwise noted.

## A.  The Incident

On July 11, 2004, Defendant Robert Shiller, Defendant Joshua Herrick, and Jason Huff, all officers with the Denver Police Department, went to the McDonald's restaurant located at 1350 West Colfax Avenue in response to a domestic violence call by Cathy Sandoval. Specifically, Sandoval reported that an individual named Vincent Martinez had beaten her and held her against her will for several hours at the residence they shared located at 1234 West 10th Avenue (the "Residence").

At the McDonald's restaurant, the officers observed physical injuries to Sandoval and determined that Martinez had two outstanding warrants for his arrest.  The warrants were apparently for failure to appear on a citation for public urination and for assault.  The officers also interviewed Sandoval who told them that she had last seen Martinez asleep on the couch in the Residence and that an uncle was also there.  The uncle that Sandoval was referring to was Frank Lobato who had apparently been living at the Residence for one to two weeks prior to July 11, 2004.  Plaintiffs assert that Sandoval further advised the officers at this time that Lobato was not involved in the assault that Martinez had inflicted upon her and that he was in an upstairs

bedroom of the Residence.  Defendants have presented evidence, however, that contradicts this assertion.  In any event, it is clear that the responding officers were advised of the possible presence of a potentially innocent party at the Residence.  At this time, Sandoval also gave Shiller her consent to enter the Residence and indicated that she did not have keys to the Residence.

Officers Shiller, Herrick, and Huff went from the McDonald's restaurant to a location near the Residence where they were joined by Defendant Ranjan Ford, Jr.  The four officers discussed the situation at hand, and Ford was advised that an uncle might also be present at the Residence. The four officers then went to the Residence where they were later joined by Defendant Gene Sharla.

The officers knocked on the doors of the Residence and announced their presence but received no response.  The officers heard noises from inside the Residence though one or more witnesses told them that they had seen a man possibly matching Martinez's description jump from a rear second story window.  Another witness indicated, however, that she had not seen anyone jump out of a rear second story window of the Residence despite having a clear view of the rear of the Residence at the relevant time.  In fact, Martinez had left the Residence by jumping out of the rear second story window shortly after the officers arrived on the scene.  At the time, all of the officers were positioned in front of the Residence.

Some of the officers on the scene, who were now positioned at the back of the Residence, discussed entering it through an open rear second story window.  Before the officers took any action, Shiller, who had remained at the front of the Residence, received an I-Call from Defendant Steven Addison, a police sergeant who was now at the McDonald's restaurant with Sandoval and Defendant Charles Kyle, another police sergeant who was also acting as lieutenant on this

particular night.  The following exchange took place:

|         |                                                                                                 |
|---------|-------------------------------------------------------------------------------------------------|
| Shiller: | ...we were able to get the shade open and there's nobody visible on the first floor. |

...

| Addison: | Then she doesn't think that he's there if he's not there sleeping on the couch. |
|---------|--------------------------------------------------------------------|

| Shiller: | OK, she doesn't think he'd be upstairs then? |
|---------|----------------------------------------------|

| Addison: | She said when they left, he was sleeping on the couch downstairs, so you would be able to see him if he was there, and if he's not there, then he's over at Nettie's. |
|---------|-----|

| Shiller: | OK, well, fire's still en route with a ladder.  Do you want us to just check that open window? |
|---------|-----|

| Addison: | Yeah, go ahead.  There should be an uncle in the house also, and he would be in one of the back bedrooms, so be careful. |
|---------|-----|

| Shiller: | Clear. |
|---------|--------|

...

| Addison: | ... we'll be over there in just a minute.  So, yeah, if there's an uncle in there, be careful. |
|---------|-----|

| Shiller: | OK, thanks. |
|---------|-------------|

Shiller did not have any further communications with the other officers on the scene regarding Martinez or the uncle's presence in the Residence following this call.

Sometime after this I-Call, Addison and Kyle arrived on the scene and went to the back of the Residence which they were incorrectly advised had been covered at all times since the officers' arrival at the Residence.  Addison and Kyle concurred with and authorized Herrick, Ford, and

-4-

Sharla's entry into the Residence through the open rear second story window using a ladder provided by the Denver Fire Department.  Thereafter, approximately 40 minutes after the officers first arrived at the Residence, Herrick, Ford, and Sharla entered the Residence through the open rear second story window while Shiller remained positioned at the front of the Residence.

Once inside the Residence, the officers cleared two of the three upstairs bedrooms and proceeded to the third bedroom where the door was closed.  There, Herrick positioned himself directly across from the closed bedroom door; Sharla positioned himself by or in the bathroom to the right of the closed bedroom door; and Ford positioned himself by or on the stairwell to the left of the closed bedroom door.  There is some dispute as to whether the officers announced their presence from their positions outside the closed bedroom door.  In any event, Sharla reached across and opened this door.  Within a few seconds, at most, from when Sharla opened the door to the bedroom, Ford fired a single shot that struck and killed Frank Lobato.  Following the shooting, Ford's fellow officers heard him say that he thought Lobato had a gun.

## B.  The Investigation

All of the officers on the scene at the Residence proceeded to police headquarters where they provided statements and were interviewed regarding the events that had transpired.  During his interview, Ford stated that he envisioned two possible scenarios upon the opening of the door to Lobato's bedroom: either the room would be empty or the person or persons inside would try to ambush him.  Once the door to the bedroom was opened, Ford further stated that Lobato sat up in bed holding a shiny object in his hand that Ford perceived to be a gun and said "what the fuck."  There is, however, significant evidence calling into question whether Lobato said anything when the door to the bedroom was opened; whether he had anything in his hand although there

were numerous soda cans throughout the room, including one on the floor in close proximity to the bed; and whether he came to a fully upright position on the bed.

A grand jury investigated the shooting of Lobato but was unable to reach an agreement on probable cause to support any of the counts against Ford in the presented indictment. The Denver District Attorney subsequently announced his decision not to charge Ford with any crimes in connection with the shooting of Lobato.

The case was then turned over to the Denver Police Department's Internal Affairs Bureau (the "IAB") for further investigation. The Use of Force Review Board (the "UFRB") likewise reviewed the case and referred it to the Tactics Review Board (the "TRB"). The TRB concluded that "[w]hile the tactics utilized during the incident did not have an adverse effect on the outcome, the [TRB] did express concern with the 2nd floor window entry and the fact that the rear of the premises was left unprotected for a period of time, allowing [Martinez] to escape." After receiving the TRB's report, the UFRB issued the following recommendations: (1) that Ford be found in violation of RR-102 Violation of Any Department Rule as it pertains to the Use of Force Policy, Operations Manual § 105.00 and suspended for 20 days; and (2) that Addison and Kyle receive oral reprimands and mandatory training for violation of RR-102 Violation of Any Department Rule as it pertains to Operations Manual §§ 8.00 & 8.34. The shooting of Lobato was also reviewed by the Disciplinary Review Board (the "DRB") which concluded that Ford's actions were reasonable and therefore recommended that no penalty be imposed on him.

After receiving the various recommendations from the reviewing boards, Whitman concluded that Ford had violated the Use of Force Policy and should therefore be suspended for 30 days. The final decision on violations of departmental policies and discipline, however, rests

-6-

with the Manager of Public Safety, Alvin J. LaCabe, Jr.  LaCabe issued an order suspending Ford

for 90 days based on his conclusions that Ford's actions on July 11, 2004 violated the Denver

Police Department's Use of Force Policy and that Ford's assessment of the threat Lobato posed

on that date was not objectively reasonable under the circumstances. Ford's suspension was

subsequently reduced to 50 days as a result of a settlement agreement reached prior to the

scheduled administrative appeal hearing.

**C.  Ford's Background and Training**

Ford had approximately 9 years of law enforcement experience before he joined the

Denver Police Department in 2001 as a lateral recruit.  As a lateral recruit, Ford received 504

hours of accredited courses over a 12 week period ending in March of 2002.  93.5 hours of this

training was devoted to the procedures, rules, and laws of the Denver Police Department, the City

& County of Denver, and the State of Colorado including the Denver Police Department's Use of

Force Policy.  Specific courses taken by Ford regarding the use of force included Use of Force

Considerations, De-escalation of Force, Alternatives to the Use of Deadly Force, and Tactical Use

of Force/Decision Making Scenarios.

Another 62 hours of Ford's training in 2002 was devoted to firearms training, with the

majority of the these courses involving hands-on training at the firing range.  Decisional shoot, or

"shoot/don't shoot," training is incorporated into a number of the firearms training courses, as

well as other courses that utilize scenario-based training.  Ford also took a course entitled

"Decisional Shooting (Range 2000)" which utilized two computer simulators to project scenarios

that the officers or recruits would have to assess and determine whether or not to fire their

weapon.

Upon completing the 12 weeks of training, Ford became a probationary police officer, 1st grade and was assigned to the Denver Police Department's Field Training and Evaluation Program. Although the field training program typically lasts for 14 weeks, there is also an abbreviated 10 week program for lateral recruits who demonstrate in their field performance that they do not need the entire 14 weeks of training. Ford completed an abbreviated 10 week field training program on May 15, 2002. From that time until the incident at issue, Ford was primarily assigned as a patrol officer in District 6.

In January of 2003, the Denver Police Department revised its Use of Force Policy. Prior to the implementation of the revised policy, all officers were required to take a 4 hour training course which Ford completed on March 25, 2003. Ford also took other training courses between the time he completed his initial training in March of 2002 and July 11, 2004.

All officers with the Denver Police Department are required to "qualify" with their firearms on a quarterly basis. To "qualify," officers must demonstrate their proficiency with their firearms by shooting at various targets. This quarterly qualifying process incorporates decisional shoot training where officers must make quick "shoot/don't shoot" decisions on various moving targets. Although all police officers are required to participate in the quarterly qualifying process, I note that there is no specific evidence regarding Ford's participation in this training/testing program.

Prior to July 11, 2004, Ford's disciplinary history with the Denver Police Department consisted of an oral reprimand for failure to appear in court and a written reprimand for failure to attend a continuing education program for which he had enrolled. In 2003, Ford was also subject to the Department's Early Identification and Intervention System ("EIIS") based on his

involvement in three incidents involving the use of force.  The resulting inter-department review

concluded that there was no discernible pattern of behavior requiring intervention strategies and

that no further action or review was recommended.

Prior to July 11, 2004, there is no evidence that Ford ever fired his weapon in the line of

duty either as a DPD officer or in his prior law enforcement experience.

## II.  Standard for Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess

whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Rule 56

provides that summary judgment shall be granted if the pleadings, depositions, answers to

interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The non-

moving party has the burden of showing that there are issues of material fact to be determined.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the pleadings, depositions,

interrogatories, and admissions on file together with affidavits, if any, which it believes

demonstrate the absence of genuine issues for trial.  *Celotex*, 477 U.S.  at 323;  *Mares v.

ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported

summary judgment motion is made, the opposing party may not rest on the allegations contained

in his complaint, but must respond with specific facts showing the existence of a genuine factual

issue to be tried.  *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e).

These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule

56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares*, 971 F.2d at 494.

### III.  Analysis

**A.  Plaintiffs' Claims against the City pursuant to 42 U.S.C. § 1983**

Plaintiff's response to Defendants' motion for summary judgment identifies the following theories for the City's liability under Section 1983: (1) failure to properly train police officers on decisional shooting and use of force policy and law; (2) improper training on the dangers of law enforcement; (3) failure to discipline officers who use deadly force; (4) failure to discipline officers who make false statements; (5) failure to properly monitor and address use of force incidents; (6) failure to hire competent officers; (7) failure to properly supervise; and (8) failure to obtain physical description of non-suspects known to be at a place to be searched. I further note that Plaintiffs base the City's liability solely on the use of excessive force against Lobato and do not raise other constitutional violations that have been asserted against other Defendants such as illegal search, violation of right to privacy, etc. as a basis for municipal liability.

Each of Plaintiffs' theories will be addressed in turn.  In general, however, a municipality

cannot be held liable under Section 1983 merely on the basis of its status as the employer of the defendant officers. *Monell v. Dept. of Social Serv.,* 436 U.S. 658, 691 (1978). Rather, a municipality can only be held liable under Section 1983 when the execution of its policies or customs inflicts the injury in question. *Id.* at 693.

### 1. Alleged Inadequate Training

In order to prevail on a claim against a municipality for failure to train its police officers, a plaintiff must first prove that the training was in fact inadequate. *Brown v. Gray,* 227 F.3d 1278, 1286 (10th Cir. 2000). A plaintiff must then prove (1) a violation of constitutional rights by the officers; (2) under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) deliberate indifference on the part of the City towards persons with whom the police officers come into contact; and (4) the existence of a direct causal link between the constitutional deprivation and the inadequate training. *Allen v. Muskogee,* 119 F.3d 837, 841-2 (10th Cir. 1997).

For purposes of the motion only, the City concedes that Ford's use of deadly force against Lobato violated his constitutional rights and occurred under circumstances that constitute a usual and recurring situation with which police officers must deal. In order to defeat the City's motion for summary judgment on their Section 1983 claim based on the alleged inadequate training of its officers then, Plaintiffs need only show genuine disputes of material fact (1) that the subject training was inadequate; (2) deliberate indifference on the part of the City towards persons with whom the police officers come into contact; and (3) the existence of a direct causal link between the constitutional deprivation and the inadequate training. So I will analyze whether Plaintiffs can meet these Rule 56 requirements with respect to each area of allegedly inadequate training.

### a.  Training on Decisional Shooting and Use of Force Policy and Law

In support of their claim that the City failed to provide its officers with adequate training on decisional shooting and use of force policy and law, Plaintiffs rely on the opinions of Louis A. Mayo, Ph.D., a designated expert in the field of police policies and practices.  Dr. Mayo opines that the City's training in these areas was deficient because it "[failed] to provide mandatory periodic, at least semi-annual, re-training on the use of force policy and law, including decisional shooting/shoot/don't shoot training" in derogation of the national standard.

The City argues that Dr. Mayo's opinions are flawed in several respects and therefore cannot establish that the City provided inadequate training to its officers.  Primarily, the City cites to the standards and recommendations of the Commission on Accreditation for Law Enforcement Agencies ("CALEA") and the International Association of Chiefs of Police ("IACP"), on which Dr. Mayo apparently relies to some degree for the national training standard, and notes that these standards and recommendations provide for annual training on use of force policy and law as opposed to semi-annual training as espoused by Dr. Mayo and do not specify how often decisional shooting training should be provided.  It is unclear, however, if Dr. Mayo's opinions regarding the City's training on decisional shooting and use of force policy and law are predicated solely on the CALEA and IACP standards and recommendations.  Moreover, the Denver Police Department admittedly did not fully comply with the recommendation of mandatory annual training on use of force policy and law prior to the shooting of Lobato.

Under these circumstances, I am unable to conclude that there is no triable issue regarding the adequacy of the City's training on decisional shooting and use of force policy and law based solely on the CALEA and IACP standards and recommendations.  I am likewise unable to

conclude that Ford received the training advocated by the CALEA and IACP in any event based on a lack of training records specific to Ford as well as Ford's deposition testimony and affidavit. Accordingly, the City is unable to meet its burden of demonstrating that there is no genuine issue as to whether that the subject training was adequate.

As for the second element of Plaintiffs' Section 1983 claim based on the City's alleged inadequate training of its officers, "[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher,* 143 F.3d 1299, 1307-08 (10th Cir. 1998).  In the specific context of inadequate training, deliberate indifference is shown when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Carr v. Castel,* 337 F.3d 1221, 1229 (10th Cir. 2003) (*quoting City of Canton v. Harris,* 489 U.S. 378, 390 (1989)).

As evidence of the City's alleged deliberate indifference to the need for more officer training on decisional shooting and use of force policy and law, Plaintiffs again rely on Dr. Mayo who opines that the City's alleged failure to properly train police officers in the use of deadly force "constitutes extreme deliberate indifference."  As the City points out, however, this opinion constitutes an inadmissbile legal conclusion and cannot be used to establish the required element of deliberate indifference by the City.  *See Specht v. Jensen,* 853 F.2d 805, 810 (10th Cir. 1988) ("when the purpose of [expert] testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed").

Plaintiffs next cite *Zuchel v. City & County of Denver,* 997 F.2d 730 (10th Cir. 1993), and argue that this case put the City on notice "that periodic shoot/don't shoot field exercises are essential for the proper training in the use of deadly force."  In *Zuchel*, the Tenth Circuit concluded that the City's failure to provide periodic live decisional shooting training despite recommendation that it do so constituted sufficient evidence of deliberate indifference to the rights of its citizens.  *Id.* at 740-1.  Plaintiff's reliance on *Zuchel* assumes that the City has failed to alter its decisional shooting training in any way since that case was decided over a decade ago.  The City, however, has presented undisputed evidence that all of its officers are required to participate in a quarterly qualifying process for their weapons which incorporates "shoot/don't shoot" range training on targets.  Under these circumstances, a finding of deliberate indifference cannot be based on a failure by the City to alter its decisional shooting training following *Zuchel*.

Plaintiffs also argue that the following statement in Whitman's affidavit demonstrates deliberate indifference on the part of the City:

> I am familiar with and have considered the recommendation by CALEA and IACP for police departments to implement mandatory annual and/or periodic re-training of its officers on use of force policy and law.  There are, unfortunately, significant cost implications for such re-training in a Department as large as ours, which employs approximately 1,400 sworn officers.  As a result it was my considered decision to begin to incorporate that training into the in-service firearms training programs and into the mandatory quarterly shoot qualifying that all officers in the department must complete.  Implementing those changes has taken longer than expected, however, the incorporation into in-service firearms training programs was accomplished within the past year, and the incorporation into quarterly shoot qualifying was accomplished within the past several weeks.  Such training had already been incorporated into some of our other in-service training courses and materials.

See Ex. A-62, ¶ 20.

By this statement, Whitman acknowledges that he was on notice that the City was not

providing mandatory annual and/or periodic retraining of its officer on use of force policy and law as recommended by law enforcement organizations. Although the timing is unclear from this statement, it is a reasonable inference that Chief Whitman had such notice at the time of the Lobato shooting in 2004. The question then becomes whether this notice of recommendations for more training on the Department's use of force policy and law further constituted notice that the City's failure to adhere to these recommendations was substantially certain to result in a constitutional violation. I conclude that this alone did not, so Plaintiffs therefore cannot establish deliberate indifference by the City based solely on Whitman's statement.

But Plaintiffs further argue that the Department's history of using deadly force demonstrates deliberate indifference to the deficiencies in its training on the use of deadly force. In particular, Plaintiffs direct my attention to the fact that the number of police shootings notably increased in the year preceding the Lobato shooting for reasons that the City found "difficult to explain fully." So this increase combined with Whitman's statement provides sufficient evidence from which a jury could find that the City knew, or should have known, that its police officers were not being adequately trained regarding the use of deadly force. Further, since the alleged deficiencies in the Department's training on decisional shooting and its use of force policy were arguably resulting in an increased number of police shootings, the jury could likewise find that the City knew or should have known that its failure to alter its training in these areas was substantially certain to result in a constitutional violation.

I therefore conclude that there is sufficient albeit slim evidence from which a jury could find deliberate indifference by the City with respect to its training on decisional shooting and use of force policy and law. I must next determine if there is sufficient evidence from which a jury

could find the existence of a direct causal link between the violation of Lobato's constitutional rights and the allegedly inadequate training Ford received in these areas.

Notwithstanding the fact that the City did not require its police officers to take mandatory annual or periodic training on its use of force policy prior to the Lobato shooting, Ford received training on this policy in each of the two years preceding the shooting as part of his academy training after he joined the Department and after the Department revised its use of force policy in 2003. According to Dr. Mayo, however, this training should have been offered semi-annually. The City also contends that all of its officers received decisional shooting training as part of the quarterly weapons qualifying process, but has failed to provide any records or other evidence to demonstrate that Ford received this training. It is also unclear if this decisional shooting training is adequate to satisfy the standards espoused by Dr. Mayo who testified that he could not imagine that any significant decisional shooting training could take place on a target range, which is where the quarterly qualifying process took place. Under these circumstances, I conclude that there are triable issues as to whether the allegedly inadequate training Ford received on decisional shooting and the Department's use of force policy caused a violation of Lobato's constitutional rights by not preparing him to respond appropriately to the situation he confronted at the Residence.

Because Plaintiffs have presented sufficient evidence on each element of their Section 1983 claim based on the City's alleged failure to provide its officers with adequate training on decisional shooting and use of force policy and law, the City's request for judgment on this Section 1983 claim theory as a matter of law must fail.

-16-

**b.  Training on Dangers of Law Enforcement**

Plaintiffs also claim that the City's training of its law enforcement officers is deficient because its training materials "grossly distorts police work as dangerous in making police officers hypersensitive and preconditioned to use deadly force when it is not legally justified."  Again, Plaintiffs largely rely on the opinions of Dr. Mayo in support of this claim.  Dr. Mayo opines that the City's training materials distort the dangerousness of police work because, among other things, these materials fail to indicate that 60% of police officers' job related deaths are caused by accidents as opposed to assaults and because they fail to acknowledge that "policing is one of the safer occupations with job related deaths comparatively low when compared with other occupations."  Although common sense makes it is difficult to accept Dr. Mayo's opinions regarding the safety of police work, I nonetheless conclude that these opinions raise triable issues on the question of whether the City's training of its law enforcement officers is deficient in that it distorts the dangerousness of the job.

Plaintiffs must next show deliberate indifference on the part of the City.  Again, this requires that the City have "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Barney*, 143 F.3d at 1307-08.  Plaintiffs' blanket assertions of deliberate indifference on the part of the City are insufficient to meet this standard.  Further, no reasonable juror could conclude that the City had notice that either the handful of pages from the City's training materials consisting primarily of poems and cartoons cited by  Dr. Mayo or the omission of statistics regarding the fatality rate for police officers made it substantially certain that its officers would engage in an unlawful use of force.  Likewise, the

portions of the affidavit of Vanessa Fields that survived Defendants' motions to strike fail to provide any evidence of deliberate indifference on the part of the City.  The City is therefore entitled to judgment as a matter of law on Plaintiffs' separate Section 1983 claim theory predicated on alleged deficient training regarding the dangers of police work because there are no triable issues on the required element of deliberate indifference on the part of the City.  Although probably lacking Rule 56 sufficiency, I need not further address the requisite element of causation.

### 2.  Alleged Failure to Discipline

Failure to discipline constitutes an unwritten policy or custom for purposes of Section 1983 and may form the basis of a municipal Section 1983 claim.  *Gates v. Unified Sch. Dist. No. 449,* 996 F.2d 1035, 1037 (10th Cir. 1993).  Like claims based on failure to train, such claims are predicated on a theory of inaction by the municipality, and the same elements discussed above are therefore applicable to this claim theory.  In light of the concessions made by the City for current purposes, Plaintiffs must meet their Rule 56 burden by showing genuine disputes of material fact of (1) a custom or policy of failure to discipline; (2) deliberate indifference on the part of the City towards persons with whom the police officers come into contact; and (3) the existence of a direct causal link between the constitutional deprivation and the City's custom or policy.

I will now address whether Plaintiffs can satisfy these elements with respect to the City's alleged failure to discipline its officers for the use of excessive force and for false reporting.

### a.  Discipline for Use of Excessive Force

To support their Section 1983 claim theory based on the City's alleged failure to discipline its officers for the use of excessive force, Plaintiffs point to the fact that from July 11, 1994 through July 11, 2004 the Department sustained less than 1% of the excessive/unnecessary force

complaints that it received in contrast with what Dr. Mayo identifies as "comparable" departments that sustained 10% to 36% of such complaints.  Although Dr. Mayo's statistical comparison included with Plaintiffs' response brief differs somewhat from that which he previously provided, the essential proposition that the City sustains significantly less excessive/unnecessary force complaints than other comparable police departments has remained constant and provides some evidence of a City custom or policy not to discipline its officers for the use of excessive force. Plaintiffs' failure to present evidence demonstrating that any of the excessive force complaints that were not sustained by the City during this ten year period were meritorious and should have been sustained, while relevant to the weight that should be accorded this evidence, does not obviate its overall value.

Plaintiffs also cite to Field's affidavit wherein she states, in part, that "[Ford] said he ... know[s] that if [he] shoot[s] someone, even wrongfully, ... [he] would not lose [his job] or be disciplined."  While this statement may be admissible to establish Ford's state of mind at the time he shot Lobato, *see* Fed. R. Evid. 803(3), it is not admissible to establish that the City in fact has a custom or policy of not disciplining its police officers for the use of excessive force.

Finally, Plaintiffs cite to the deposition testimony of LaCabe, the Manager of Safety, in support of their claim that the City failed to discipline its police officers for the use of excessive force.  In the portions of LaCabe's testimony that were provided to the Court**,** he acknowledged that there were "structural and/or inherent impediments" to his ability to effectively discipline police officers that produced "sometimes inconsistent results."  According to LaCabe, these impediments consisted of (1) "no written guidelines as it relates to discipline and the actual imposition of discipline;" (2) "no uniform philosophy from the police departments as to what

discipline should be designed to do;" and (3) deficiencies in the practice of utilizing "comparable discipline." LaCabe also testified that he was unaware of any incidents in some preceding number of years where an officer was disciplined for the unreasonable use of deadly force. On more than one occasion, LaCabe stressed that his testimony was unrelated to the determination of whether there was an unreasonable use of force in the first instance but was focused solely on determining what the appropriate discipline for a sustained violation should be.

While LaCabe's testimony may constitute evidence that the City's customs and policies for determining the appropriate discipline once there has been a determination of an excessive or unreasonable use of force are deficient in some respects, this testimony does support Plaintiff's contention that the City has a policy or custom of not disciplining its police officers for the use of excessive force. Since neither LaCabe's deposition testimony nor the Fields affidavit constitute evidence of a City custom or policy not to discipline its officers for the use of excessive force, I must determine whether Dr. Mayo's statistical comparison alone is sufficient to create a triable issue as to the existence of such a policy. I conclude that it is. *Compare Thomas v. City of Chattanooga,* 398 F.3d 426, 432 (6th Cir. 2005) (expert's conclusion of municipal policy of condoning use of excessive force based on mere number of complaints filed is insufficient to create genuine issue of material fact regarding existence of such policy).

Plaintiffs must next show that the City's alleged policy of failing to discipline its police officers for the use of excessive force constituted deliberate indifference towards the citizens it serves. Again, this standard is satisfied if the City had actual or constructive notice that its failure to discipline was substantially certain to result in a constitutional violation, and it consciously or deliberately chose to disregard the risk of harm. *Barney*, 143 F.3d at 1307. Typically, notice can

be established by evidence of a pattern of tortious conduct.  *Id.*  "In a 'narrow range of circumstances,' however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of the municipality's action or inaction."  *Id.* at 1307-8.

Here, Plaintiffs have not presented evidence of a pattern of excessive force by the City's police officers.  Nevertheless, the City knows with virtual certainty that its officers will be required to utilize some degree of force in certain situations that they encounter.  There is therefore an obvious need to discipline officers for the unreasonable use of such force so as to ensure that they respond appropriately in these situations.  Incidents of excessive force, such as that which arguably occurred in this case, are a "highly predictably" and "plainly obvious" result of a custom or policy of failing to discipline police officers for the use of excessive force. Accordingly, Plaintiffs have raised a triable issue regarding deliberate indifference by the City with respect to its alleged failure to discipline its officers for the use of excessive force.

Finally, Plaintiffs must show the existence of a direct causal link between Ford's alleged use of excessive force against Lobato and the City's purported custom or policy of failing to discipline its officers for the use of excessive force.  The City argues that Plaintiffs cannot meet the rigorous standard of causation that is applied in Section 1983 cases where a plaintiff is claiming that a municipality caused an employee to inflict an injury, *see Board of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1998), because they cannot show that Ford had knowledge of any custom or policy of the City not to discipline officers for the use of excessive force.  This argument overlooks the Fields affidavit wherein she states that "[Ford] said he ... know[s] that if [he] shoot[s] someone, even wrongfully, ... [he] would not lose [his job] or be

disciplined." As set forth previously, this statement is admissible to show Ford's state of mind and also creates a triable issue as to whether the shooting of Lobato was caused by Ford's perception of the likely consequences of unconstitutional conduct.

Again, although close, Plaintiffs have presented sufficient evidence on each element of their Section 1983 claim theory based on the City's alleged failure to discipline its officers for the use of excessive force, so the City's request for judgment on this claim theory as a matter of law must fail.

### b.  Discipline for False Statements

The basis for Plaintiffs' claim theory that the City is liable under Section 1983 for failure to discipline its officers for false statements is difficult to ascertain.  In Dr. Mayo's affidavit, he states that this failure to discipline "directly causes police officers to lie and engage in cover-ups that prevent the Denver Police Department from properly investigating use of force, including use of deadly force, complaints."  Dr. Mayo further opines that if the officers at the Residence had correctly reported to Addison and Kyle that the rear of the Residence had not been continually covered, these supervising officers "should have taken other steps ...rather than to enter the residence" and that their false statements to the contrary "led directly to police officers being in a position to have to make a decision as to the use of deadly force."

Apparently then, Plaintiffs are claiming that the City's alleged policy or custom of failing to discipline its officers for false statements caused a use of excessive force against Lobato.  The problems with this argument are manifest.  Even assuming that Plaintiffs can establish the existence of such a policy or custom and deliberate indifference on the part of the City, a finding of causation would require first a determination that the officers would have conveyed accurate

-22-

information to Addison and Kyle regarding their coverage of the back of the Residence but for

this policy.  Plaintiffs would then have to show that armed with such information Addison and

Kyle would have directed the officers not to enter the Residence, which is in direct contradiction

to the deposition testimony of Kyle that "no matter what [the officers] still needed to clear [the

Residence]."  Further, even if misstatements regarding coverage of the back of the Residence

caused the officers to enter it, these statements did not also cause Ford to employ excessive force

against Lobato but merely placed him in a position to have to make a decision about the use of

deadly force.  Such attenuated causation is insufficient to satisfy the "rigorous standard"

applicable to this claim.  *See Brown,* 520 U.S. at 405.   The City is therefore entitled to judgment

as a matter of law on Plaintiffs' Section 1983 claim theory predicated on its alleged failure to

discipline is officers for false statements.

### 3. Alleged Failure to Properly Monitor and Address Repeated Use of Force Incidents

Like their claim theories based on failure to train and failure to discipline, Plaintiffs' claim

theory that the City failed to properly monitor and address repeated use of force incidents by its

officers is predicated on a theory of inaction by the City.  The same elements previously set forth

are therefore applicable, and Plaintiffs must again meet their Rule 56 burden showing genuine

issues of material fact of (1) a custom or policy of failing to properly monitor and address use of

force incidents; (2) deliberate indifference on the part of the City towards persons with whom the

police officers come into contact; and (3) the existence of a direct causal link between the

constitutional deprivation and the City's custom or policy.

In support of their contention that the City failed to properly monitor and address repeated

use of force incidents, Plaintiffs rely on the affidavit of Dr. Mayo who opines that the City's early

warning system to identify officers who engage in frequent uses of force that was in place at the time of the Lobato shooting was deficient "in that it failed to implement re-training or other remedial steps for officers who were identified, including Officer Ford, who had been repeatedly involved in use of force incidents." Dr. Mayo further opines that the determination that there was "no discernable pattern of behavior requiring intervention strategies" to the use of force incidents involving Officer Ford did not obviate the need for remedial measures since the need for such measures is triggered by the mere number of incidents rather than the existence of a pattern. Although the bases for Dr. mayo's opinions regarding the City's early warning system are somewhat unclear, these opinions are nonetheless sufficient to create a triable issue as to whether the City had a custom or policy of failing to properly monitor and address repeated use of force incidents.

Plaintiffs must next show that the City's alleged policy of failing to properly monitor and address repeated use of force incidents by its officers constituted deliberate indifference. Again, Dr. Mayo's conclusory statement of deliberate indifference on the part of the City may not be used to make such a showing. Although Dr. Mayo also references "national standards" with which the City was purportedly not in compliance, his failure to delineate or identify the source for these standards precludes a finding that the City had reason to know that its system for monitoring and addressing use of force incidents was deficient based on these standards. Plaintiffs' complete mischaracterization of the status and operation of the City' early warning system following the shooting of Lobato likewise fails to provide any evidence of deliberate indifference on the part of the City. Simply put, there is no evidence that the City disregarded notice that its failure to provide re-training or to take other remedial actions in response to Officer

Ford's use of force of far lesser magnitude under drastically different circumstances was substantially certain to result in an incident such as the deadly shooting at issue in this case.  As a result, the City is entitled to judgment as a matter of law on Plaintiffs' Section 1983 claim theory based on its alleged failure to properly monitor and address repeated use of force incidents.

### 4. Alleged Failure to Hire Competent Police Officers

Plaintiffs' Amended Complaint alleges that the City "knew or should of known of the Defendant, Ford's, dangerous propensities to shoot and kill without justification and to deny citizens of their civil rights and to deny the civil rights of persons that the Defendants ... would come into contact with as a police officer in the City and County of Denver."  In their response to the City's summary judgment motion, Plaintiffs also generally reference the City's alleged failure to hire competent recruits.  Plaintiffs' response is, however, devoid of citation to evidence that would support a claim of inadequate hiring practices.

In section 1983 municipal liability cases involving hiring decisions, the Supreme Court has indicated that courts must adhere to rigorous requirements of culpability and causation lest municipal liability collapse into respondent superior liability. *Brown*, 520 U.S. at 415.  Having failed to identify any evidence in support of its claim based on the City's hiring decisions or practices, Plaintiffs clearly cannot meet these stringent standards and this claim theory fails as a matter of law.

### 5.    Alleged Failure to Supervise

In support of their Section 1983 claim theory against the City for an alleged failure to supervise events at the Residence, Plaintiffs cite the opinions of Dr. Mayo and H. Ellis Armistead, another designated expert in police practices, that were critical of various alleged acts by Addison

and Kyle.  In particular, Plaintiffs' experts fault Addison and Kyle for approving of the entry into

to the Residence as it occurred and for failing to consider and implement other alternatives.  As

previously set forth, however, the City cannot be held liable for the actions of Addison and Kyle

under a theory of *respondeat superior.*  Rather, Plaintiffs must show that the City's policies or

customs caused a violation of Lobato's constitutional rights.

Plaintiffs also arguably identify the following alleged City customs, policies, or actions  in

support of their Section 1983 claim for alleged failure to supervise: (1) an alleged policy of not

basing promotion decisions on past performance that purportedly resulted in the promotion of

Kyle to the rank of lieutenant shortly after the shooting of Lobato; (2) an alleged policy of

imposing discipline by oral or written reprimand so as to preclude review by the Manger of Safety

as occurred with respect to Addison and Kyle; (3) the City's failure to investigate Shiller, Herrick,

and Sharla for making false police reports and obstructing justice; and (4) the substandard nature

of the entire police operation at the Residence.  It is not clear how any of these allegations reflect

a failure by the City to properly supervise its police officers.  In any event, I conclude that these

allegations fail to support Plaintiffs' Section 1983 claim theory based on the City's alleged failure

to properly supervise.

First, it cannot be reasonably concluded that particular incidents occurring after the

Lobato shooting based on largely unsubstantiated general policies caused a violation of Lobato's

constitutional rights.  For instance, a jury would have to find that Kyle's conduct at the Residence

was motivated in some way by knowledge that he could subsequently be promoted within the

Department regardless of the outcome of the police operation there.  This is beyond any

reasonable stretch of the imagination.  Further, Plaintiffs' reliance on *Strachan v. City of Federal*

*Heights,* 837 F. Supp. 1086 (D.C. Cir, 1983), in support of municipal liability for a substandard police operation is entirely misplaced since the Section 1983 analysis referenced by Plaintiffs is limited to the liability of the individual officers.  There is also no evidence to show that the police operation at the Residence was in conformance with the customs and policies of the Department. *Compare Strachan,* 837 F. Supp. at 1092 (city's admission under Fed. R. Civ. P. 36(b) that officer's conduct during incident at issue was in conformance with city custom and policy supported denial of summary judgment on Section 1983 municipal liability claim).  Indeed, Plaintiffs' citation to evidence that other police officers questioned the tactics employed at the Residence supports the opposite conclusion.

For these reasons, the City is entitled to judgment as a matter of law on Plaintiffs' Section 1983 claim theory based on its alleged failure to properly supervise.

### 6.  Alleged Custom of Not Obtaining Physical Descriptions of Non-Suspects

Plaintiffs claim that the City has a custom of not obtaining the physical description of non-suspects or innocent persons known to be in a place to be searched and that this alleged custom constitutes deliberate indifference to the safety of such persons.  As evidence of the existence of this alleged custom, Plaintiffs cite to the deposition testimony of Sgt. Addison who explained why no physical description of Lobato was obtained prior to the officers' entry into the Residence:

> Officers were there to look for the suspect.  They're not there necessarily looking for other people.  You want to make sure they're just focusing on the suspect and identifying the suspect.

Sgt. Addison further testified that he could not recall ever getting a description of any person other than the suspect at a location to be searched in ten years.

The City argues that the testimony of Sgt. Addison regarding only his own behavior is

insufficient to establish a custom on the part of the City.  I agree.  In order for a practice to constitute a municipal custom it must be permanent and well settled.  *See Monell*, 436 U.S. at 691 (*quoting Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970)).  Sgt. Addison's testimony about his personal practices regarding physical descriptions when non-suspects are known to be at a location and what was done in this particular case is insufficient to create a triable issue as to whether these practices constitute a City custom.  Moreover, since it is apparent that Plaintiffs' expert, Mr. Armistead, relied solely on Sgt. Addison's testimony in concluding that there was a department-wide policy of not obtaining descriptions of non-suspects present at locations to be searched, his affidavit is likewise insufficient to create a triable issue regarding the existence of such a custom.  In the absence of a City custom or policy, there is no basis for Section 1983 municipal liability.  *Monell*, 436 U.S. at 694.

In their response brief, Plaintiffs seemingly attempt to expand the scope of this claim theory by stating that is based "not only on the failure to obtain the physical description of [Lobato] by the police, but their complete failure to be concerned about the safety of [Lobato] who they knew to be in the back bedroom..."  There is, however, no evidence to support the finding of a broader custom or policy to disregard the interests of non-suspects present at a location to be searched.  The assertions by Plaintiffs and Mr. Armistead regarding such a policy or custom therefore fail to create a triable issue as to whether the City may be held liable for the same, and the City is entitled to judgment on Plaintiffs' Section 1983 claim predicated on the City's treatment of non-suspects at search locations as a matter of law.

## B.  Plaintiffs' Claims against the City pursuant to 42 U.S.C. § 1985

In their response brief, Plaintiffs failed to address the City's argument that their conspiracy

claims against it pursuant to 42 U.S.C. § 1985 should be dismissed or offer any evidence in support of this claim.  The City's argument in support of the dismissal of this claim is essentially that Plaintiffs cannot prove an unlawful conspiracy on the part of the individual Defendants and that there is therefore no basis for municipal liability under Section 1985.  *See Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993) (in order to prevail on a claim under Section 1985, Plaintiffs must prove, among other things, a conspiracy to deprive plaintiff of equal protection or equal privileges and immunities).  In support of this argument, the City adopted by reference the facts and arguments set forth in the briefs of the individual Defendants.  Here I adopt by reference those portions of its Orders on the individual Defendants' summary judgment motions that addressed Plaintiffs' Section 1985 claims against them and similarly conclude that Plaintiffs' claims against the City under Section 1985 must fail.

## C.  Plaintiffs' Claims Against Whitman

Defendants' primary argument in support of the dismissal of the claims against Whitman is that these claims are redundant to those asserted against the City since Plaintiffs have only sued Whitman in his official capacity as Chief of Police for the City.  In response, Plaintiffs assert that this argument must fail because they have sued Whitman in his individual capacity.  In determining the proper characterization of Plaintiffs' claims against Whitman, my central inquiry is whether Plaintiffs' intention to hold Whitman personally liable can be fairly ascertained based on a number of factors.  *Biggs v. Meadows,* 66 F.3d 56, 61 (4th Cir. 1995).  I will now analyze these factors.

"In discerning whether a lawsuit is against a defendant personally or in his official capacity, the caption may be informative but clearly is not dispositive." *Pride v. Does,* 997 F.2d 712, 715 (10th Cir. 1993).  Here, Plaintiffs named as defendants six police officers "individually

and as a Police Officer for the City and County of Denver" while naming Whitman solely as

"Chief of Police of the City and County of Denver."  Plaintiffs were therefore aware of how to

specify that they were suing various Defendants in an individual capacity yet failed to do so with

respect to Whitman.  Assuming that Plaintiffs have nonetheless failed to specify whether they

were suing Whitman in his personal capacity, I next look to the substance of the pleading and the

course of the proceedings.  *Id.*

Plaintiffs' First Amended Complaint repeatedly refers to Whitman by his name together

with his job title as Chief of Police and in conjunction with the City.  Additionally, Plaintiffs'

allegations against Whitman are predicated on policies and practices of the Department with

respect to the hiring, supervising, and training of police officers.  *See Biggs*, 66 F.3d at 61 (one

factor indicating that suit has been brought in individual capacity is failure to allege that the

defendant acted in accordance with a governmental policy or custom).  Although Plaintiffs'

request for punitive damages against Whitman might suggest that he was being sued individually,

*see e.g. Pride,* 997 F.2d at 715, the fact that Plaintiffs also request punitive damages against the

City undermines the significance of this request.   Under the circumstances then, Plaintiffs'

purported intention to hold Whitman personally liable cannot be fairly ascertained from their First

Amended Complaint.

It is also apparent from the course of the proceedings that Whitman did not interpret

Plaintiffs' claims to be against him personally.  Significantly, Whitman answered Plaintiffs' First

Amended Complaint solely in his official capacity as Chief of Police for the City and did not assert

the defense of qualified immunity.  *Compare Pride,* 997 F.2d at 715-16.  Whitman also asserted

as a defense that he was immune to punitive damages which would only be the case if he was sued

in his official capacity.  Plaintiffs' responses to interrogatories that they cite in their response brief likewise fail give any indication that they were seeking to hold Whitman liable in his individual capacity since these responses again emphasize Whitman's involvement with policies and customs of the Department.  Again then, Plaintiffs' purported intention to hold Whitman personally liable cannot be fairly ascertained from the course of proceedings in this case.

Since neither the case caption, the content of Plaintiffs' First Amended Complaint, nor the course of proceedings in this case fairly demonstrate Plaintiffs' intention to hold Whitman personally liable, I conclude that Plaintiffs have sued Whitman solely in his official capacity as Chief of Police for the City.  I further conclude that is appropriate to dismiss the claims against Whitman for purposes of clarity and to eliminate the redundancy in Plaintiffs' claims.  *See Monell*, 436 U.S. at 691 n. 55 ("official-capacity suits generally represent only another way of pleading an action against an entity of which the officer is an agent").

**D.  Plaintiffs' Claim for Punitive Damages**

In their response brief, Plaintiffs concede that they cannot recover punitive damages against the City.  The same is true with respect to Whitman since he has been sued solely in his official capacity. *See Pride,* 997 F.2d at 715.

For the reasons set forth above, , IT IS ORDERED that

1.  Defendants the City and Whitman's Motion for Summary Judgment [Doc # 125] is GRANTED IN PART and DENIED IN PART;

2.  Plaintiffs' claims against Whitman are hereby DISMISSED WITH PREJUDICE in their entirety;

3.  Plaintiffs' claims against the City under 42 U.S.C. § 1983 based on (2) improper training on the dangers of law enforcement; (4) failure to discipline police officers for false statements; (5) failure to properly monitor and address repeated use of force incidents; (6) failure to hire competent police officers; (7) failure to supervise; and (8) failure to obtain physical descriptions of non-suspects at search locations are hereby DISMISSED WITH PREJUDICE;

4.  The City's Motion for Summary Judgment on Plaintiffs' claims under 42 U.S.C. § 1983 based on (1) failure to train on decisional shooting and use of force policy and (3) failure to discipline for the use of excessive force is DENIED;

5.  Plaintiffs' claims against the City under 42 U.S.C. § 1985 are hereby DISMISSED WITH PREJUDICE; and

6.  Plaintiffs' claim against the City for punitive damages is hereby DISMISSED WITH PREJUDICE.


Dated: October ___31___, 2007 in Denver, Colorado.

BY THE COURT:


___s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE