IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 05-cv-01437 - LTB - CBS

FRANCISCO JUAN LOBATO, individually and as the personal representative of the estate of
Frank Lobato;
ANTHONY LOBATO;
BARBARA LOBATO; and
RAMONA LOBATO,

       Plaintiffs,

v.

RANJAN FORD, JR., individually and as a Police Officer for the City and County of Denver;
JOSHUA HERRICK,  individually and as a Police Officer for the City and County of Denver;
GENE SHARLA, individually and as a Police Officer for the City and County of Denver;
ROBERT SHILLER,  individually and as a Police Officer for the City and County of Denver;
CHARLES KYLE, individually and as a Police Officer for the City and County of Denver;
STEVEN ADDISON, individually and as a Police Officer for the City and County of Denver;
JOHN and JANE DOES, Denver Police Officers whose true names and identities are unknown;
GERALD WHITMAN, Chief of Police of the City and County of Denver; and
THE CITY AND COUNTY OF DENVER, a municipal corporation,

       Defendants.

_____

ORDER
_____

       This case is before me on Defendant Ranjan Ford, Jr.'s Motion for Summary Judgment [Doc

# 123].  After consideration of the motion and all related pleadings, as well as the case file, I grant

the motion in part and deny it in part as set forth below.

## I.  Facts

       The following facts are undisputed unless otherwise noted.  On July 11, 2004, Defendant

Robert Shiller, Defendant Joshua Herrick, and Jason Huff, all officers with the Denver Police

Department, went to the McDonald's restaurant located at 1350 West Colfax Avenue in response to

a domestic violence call by Cathy Sandoval.  Specifically, Sandoval reported that an individual named Vincent Martinez had beaten her and held her against her will for several hours at the residence they shared located at 1234 West 10th Avenue (the "Residence").

At the McDonald's restaurant, the officers observed physical injuries to Sandoval and determined that Martinez had two outstanding warrants for his arrest.  The warrants were apparently for failure to appear on a citation for public urination and for assault.  The officers also interviewed Sandoval who told them that she had last seen Martinez asleep on the couch in the Residence and that an uncle was also there.  The uncle that Sandoval was referring to was Frank Lobato who had apparently been living at the Residence for one to two weeks prior to July 11, 2004.  Plaintiffs assert that Sandoval further advised the officers at this time that Lobato was not involved in the assault that Martinez had inflicted upon her and that he was in an upstairs bedroom of the Residence.  Defendants have presented evidence, however, that contradicts this assertion.  In any event, it is clear that the responding officers were advised of the possible presence of a potentially innocent party at the Residence.  At this time, Sandoval also gave Shiller her consent to enter the Residence and indicated that she did not have keys to the Residence.

Officers Shiller, Herrick, and Huff went from the McDonald's restaurant to a location near the Residence where they were joined by Ford.  The four officers discussed the situation at hand, and Shiller told Ford that an uncle might be present at the Residence.  Although Plaintiffs dispute that there could have been any confusion on the part of Shiller, Herrick, and Huff as to whether the uncle was involved in the domestic dispute between Martinez and Sandoval, there is no evidence to contradict Ford's contention that Shiller told him that it was unknown whether Lobato was involved in these events.  There is likewise no evidence to contradict Ford's contention that he was not given

a physical description of Lobato though other officers may have been aware that Lobato was an elderly Hispanic man.  The four officers then went to the Residence where they were joined by Defendant Gene Sharla.

The officers knocked on the doors of the Residence and announced their presence but received no response.  The officers heard noises from inside the Residence though one or more witnesses told them that they had seen a man possibly matching Martinez's description jump from a rear second story window.  Another witness indicated, however, that she had not seen anyone jump out of a rear second story window of the Residence despite having a clear view of the rear of the Residence at the relevant time.  In fact, Martinez had left the Residence by jumping out of the rear second story window shortly after the officers arrived on the scene.  At the time, all of the officers were positioned at the front of the Residence.

Defendants Sharla, Herrick, and Ford, who were now positioned at the back of the Residence, discussed entering it through an open rear second story window.  Before the officers took any action, Shiller, who had remained at the front of the Residence, received an I-Call from Defendant Steven Addison, a police sergeant who was now at the McDonald's restaurant with Sandoval and Defendant Charles Kyle, another police sergeant who was also acting as lieutenant on this particular night.  The following exchange took place:

| | |
|---|---|
| Shiller: | ...we were able to get the shade open and there's nobody visible on the first floor. |
| ... | |
| Addison: | Then she doesn't think that he's there if he's not there sleeping on the couch. |
| Shiller: | OK, she doesn't think he'd be upstairs then? |

Addison:      She said when they left, he was sleeping on the couch
              downstairs, so you would be able to see him if he was
              there, and if he's not there, then he's over at Nettie's.

Shiller:      OK, well, fire's still en route with a ladder.  Do you
              want us to just check that open window?

Addison:      Yeah, go ahead.  There should be an uncle in the
              house also, and he would be in one of the back
              bedrooms, so be careful.

Shiller:      Clear.

...

Addison:      ... we'll be over there in just a minute.  So, yeah, if
              there's an uncle in there, be careful.

Shiller:      OK, thanks.

There is no evidence that Shiller had any communications with the other officers on the scene

regarding Martinez or Lobato's presence in the Residence following this call.

Sometime after this I-Call, Addison and Kyle arrived at the Residence.  Addison and Kyle

went to the back of the Residence where they concurred with and authorized Herrick, Ford, and

Sharla's entry into the Residence through the open rear second story window using a ladder provided

by the Denver Fire Department.  Thereafter, approximately 40 minutes after they first arrived at the

Residence, Ford, Herrick, and Sharla climbed a ladder and entered the Residence through the open

rear second story window.

Once inside the Residence, the officers cleared two of the three upstairs bedrooms and

proceeded to the third bedroom where the door was closed.  There, Herrick positioned himself

directly across from the closed bedroom door; Sharla positioned himself by or in the bathroom to the

right of the closed bedroom door; and Ford positioned himself by or on the stairwell to the left of the closed bedroom door. Ford asserts that the officers announced their presence prior to opening the door to this bedroom. However, witnesses who were observing the events at the Residence dispute this assertion. Accordingly, for purposes of Ford's motion for summary judgment, I will assume that the officers inside the Residence did not announce their presence prior to the time that Sharla reached across and opened the closed bedroom door.

Once the door to the third bedroom was opened, Ford asserts that Lobato sat up in bed and said "what the fuck." Since the other officers present at the time are unable to corroborate that Lobato made any statement when the door to the bedroom was opened, I will assume that he did not for purposes of the current motion. I also note that there is a dispute as to Lobato's position on the bed when the door to the bedroom was opened and will therefore assume that he did not come to a fully upright position as Ford contends.

Ford further asserts that he immediately observed a shiny object in Lobato's hand that he believed to be a gun and that, based on this belief, he fired one shot into the bedroom that struck and killed Lobato. There is sufficient evidence, however, to create a factual dispute as to whether Lobato was holding anything when the door to the second story bedroom was opened. Nonetheless, I note that there were beverage cans on a stand or table next to the bed where Lobato was found and that another beverage can was found on the floor after the shooting. I further note that following the shooting, Ford's fellow officers heard him say that he thought Lobato had a gun.

At most, a few seconds passed from the time the officers opened the door to the second story bedroom and when Ford fired the shot that killed Lobato. Following the shooting, Shiller entered the Residence by kicking in the front door while Addison and Kyle entered the Residence by kicking

-5-

in the rear door. Shiller and Sharla carried Lobato's nude body down the stairs of the Residence, with Shiller supporting Lobato's upper body and Sharla supporting his lower body. According to Shiller and Sharla, they left Lobato's nude body at the bottom of the stairs by the front door inside the Residence so that emergency response personnel could have easy access to him. Eyewitnesses, however, claim that they saw police officers place Lobato's nude body on a stretcher outside the Residence where it was viewed by people in the neighborhood.

On August 5, 2005, the Manager of Safety for the City and County of Denver issued an order suspending Ford for 90 days based on his conclusions that Ford's actions on July 11, 2004 violated the Denver Police Department's Use of Force Policy and that Ford's assessment of the threat Lobato posed on that date was not objectively reasonable under the circumstances. Ford's suspension was subsequently reduced to 50 days as a result of a settlement agreement reached prior to the scheduled administrative appeal hearing.

## II.  Standard for Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e).

These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares*, 971 F.2d at 494.

### III. Analysis

In their First Amended Complaint, Plaintiffs assert claims against Ford pursuant to 42 U.S.C. §§ 1983 & 1985. Although it is somewhat unclear from Plaintiffs' First Amended Complaint, Plaintiffs' response to Ford's motion for summary judgment clarifies that their Section 1983 claim against Ford is predicated on a purported unlawful search and use of excessive force in violation of Lobato's Fourth Amendment rights and that their Section 1985 claim against Ford is predicated on his role in purported conspiracies to unlawfully enter and search the Residence and to cover-up what

occurred following this unlawful entry and thereby deprive Plaintiffs of their right of access to the courts. *See also Sacremento v. Lewis,* 523 U.S. 833, 842-3 (1998) (Because alleged unlawful search and use of excessive force are specifically covered by the Fourth Amendment, substantive due process standards do not apply).

By the motion, Ford argues that he cannot be held liable on Plaintiffs' claims based on the doctrine of qualified immunity. Ford further argues that there is insufficient evidence to support Plaintiffs' conspiracy claims.

## A. The Doctrine of Qualified Immunity

The doctrine of qualified immunity shields governmental officials performing discretionary functions from liability for civil damages provided that their conduct does not violate clearly established constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Once a defendant asserts the defense of qualified immunity, the plaintiff must establish (1) that the defendant's actions violated a constitutional or statutory right; and (2) that the law was clearly established such that a reasonable person in the defendant's position would have known that their conduct violated the law. *Garrett v. Stratman,* 254 F.3d 946, 951 (10th Cir. 2001).

The threshold question is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendant's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If, and only if, the violation of a constitutional right can be established under such a view of the facts, the next sequential step is to determine whether the right was clearly established. *Id.*

I will now analyze sequentially, as I must, whether Plaintiffs can meet the two-part test to defeat Ford's defense of qualified immunity with respect to his role in the search of Lobato's bedroom

and in his fatal shooting of Lobato.

### 1. The Search of Lobato's Bedroom

As a preliminary matter, I must determine whether the officers' conduct in opening the door to Lobato's bedroom without prior notice as alleged by Plaintiffs and firing a shot into this room constitutes a "search" for purposes of the Fourth Amendment.

A search under the Fourth Amendment "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984). Whether an individual has constitutionally protected reasonable expectation of privacy in a place is determined by two factors: "(1) whether the individual has manifested a subjective expectation of privacy in the object or place to be searched and (2) whether that expectation is one that society is prepared to recognize as reasonable." *Reeves v. Churchich,* 484 F.3d 1244, 1254 (10th Cir. 2007). "[T]he burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation." *United States v. Cavely,* 318 F.3d 987, 994 (10th Cir. 2003).

By closing the door to his bedroom, Lobato manifested a subjective expectation of privacy in his bedroom. Further, "[i]t is well-settled that an individual has a reasonable expectation of privacy in the interior of one's home." *Reeves,* 484 F.3d at 1254. Under these circumstances, it is readily apparent that Lobato had a reasonable expectation of privacy in the room where he was staying. The next question then is whether the officers infringed on that expectation by opening the door to Lobato's bedroom and firing a shot into it. This question must be answered in the affirmative based both on the physical intrusion into this room by the bullet fired from Ford's weapon as well as the officers' viewing of this room in a manner not available to members of the public. *Compare United*

*States v. Taylor,* 90 F.3d 903, 908 (4th Cir. 1996) (law enforcement officers did not engage in search under the Fourth Amendment by looking through picture window adjacent to front door as anyone at the front entranceway of their home could have done). The officers' therefore conducted a search of Lobato's bedroom under the Fourth Amendment. I must therefore proceed with an analysis of whether this search was in violation of Lobato's rights.

Although searches and seizures inside a home without a warrant are presumptively unreasonable, police officers may nonetheless conduct a warrantless search where they have probable cause to search the location in question and exigent circumstances exist to make the warrant requirement impractical. *United States v. McCullough,* 457 F.3d 1150, 1163 (10th Cir. 2006). In such situations, however, the scope of the warrantless search is strictly limited by the exigencies which justified it in the first instance. *Id.* Police officers may also conduct a warrantless search when voluntary consent to the search has been given. *See United States v. Bute,* 43 F.3d 531, 534 (10th Cir. 1994) (recognizing voluntary consent as exception that renders warrantless search reasonable).

Here, Ford argues that the warrantless search of the Residence was lawful based both on Sandoval's consent to the police officers' entry into the Residence and the fact that Martinez, who had assaulted Sandoval and had two outstanding warrants for his arrest, was last seen at the Residence. But I am unable to conclude that the officers' entry into Lobato's bedroom was lawful based on either of these exceptions to the warrant requirement and therefore cannot conclude that Ford did not violate Lobato's Fourth Amendment right to be free from unlawful searches as a matter of law.

It is undisputed that Sandoval, the sole lessee, consented to the police officers' entry in the Residence. Plaintiffs argue, however, that the officers' entry into the Residence nonetheless violated

Lobato's Fourth Amendment rights because as a houseguest or co-inhabitant of the Residence he had an legitimate expectation of privacy in his bedroom that Sandoval could not waive.  So, Plaintiffs argue that Sandoval did not have authority to consent to a search of Lobato's bedroom.

In *U.S. v.Rith,* 164 F.3d 1323, 1329 (10th Cir. 1999), the Tenth Circuit held that a third party has the authority to consent to a search of property if that third party has either "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."  "Control for most purposes over property is a normative inquiry dependent on whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  *Id.* at 1330.   Relationships which give rise to a presumption of control include that of parent-child and husband-wife but not that of simple co-tenants.  *Id.* Accordingly, no presumption of control arises in this case based on Lobato's status as a houseguest or co-inhabitant of the Residence.  In order to establish that Sandoval had the authority to consent to the search of Lobato's bedroom then, Ford must show that Sandoval had mutual use of the bedroom by virtue of joint access.

"Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search."  *Id.* at 1329-30.  Here, Sandoval has given the following deposition testimony about her use of the bedroom where Lobato was staying:

Q: Now, as I understand it, Mr. Lobato also had a small television in his bedroom.

A: Right.

Q: Did he use that television at times?

A: I would assume.  I don't know.  I never invaded his space.

...

Q: Did he share the room with anybody even though they didn't stay there?  In other words, did your kids have things there in his room?  Did you have things in that room?

A: Yes.

Q: What things did you have in that room?

A: I think just clothes were in the room for the kids and stuff.

This testimony suggests that Sandoval may have continued to make some use of Lobato's bedroom but did not come and go freely from it.  With no other evidence currently before me regarding Sandoval's use of this bedroom, I am unable to conclude that no genuine dispute of fact exists so as to support a conclusion that Sandoval had the authority to consent to the search of this room.

Even if Sandoval did not have actual authority to consent to the search of Lobato's bedroom, she may have had apparent authority to do so if the officers reasonably, but erroneously, believed that she had actual authority to consent.  *U.S. v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007).  The apparent authority inquiry is an objective one requiring a determination of whether "the facts available to the officer at the moment ... warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises."  *Id.* (*quoting Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990)).  The same standards set forth in *Rith* regarding actual authority are applicable to this inquiry such that "a third party has apparent authority if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" *Id.* (*quoting Rith,* 164 F.3d at 1329).

Arguably, Sandoval's undisputed status as an inhabitant of the Residence led the officers to reasonably believe that she satisfied the *Rith* standards.  However, "where an officer is presented with ambiguous facts relating to authority, he or she has a duty to investigate further before relying on the consent." *Cos*, 498 F.3d at 1128 (*quoting U.S. v. Kimoana,* 383 F.3d 1215, 1222 (10th Cir. 2004). Here, the officers were advised of Lobato's presence in the Residence but apparently made no effort to determine his status with respect to the Residence, or any part of it, or whether his Fourth Amendment rights would be implicated by a search of it.  Under these circumstances, and with no briefing on the issue of apparent authority by any of the parties, I am unable to conclude that Sandoval had apparent authority to consent to the search of Lobato's bedroom as a matter of law. Accordingly, there are outstanding issues relating to Sandoval's voluntary consent to a search of Lobato's bedroom that preclude a finding that Ford did not violate Lobato's Fourth Amendment rights by this search on the basis of such consent.

In support of his argument that exigent circumstances justified the officers' warrantless search of the Residence and Lobato's bedroom, Ford relies on the undisputed fact that there was strong evidence that Martinez had physically assaulted Sandoval and the undisputed fact that there were two outstanding warrants for Martinez's arrest.  Exigent circumstances exist when "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *U.S. v. Najar,* 451 F.3d 710, 718 (10th Cir. 2006).

Here, although the officers had a legitimate objective of removing Martinez from the Residence so that Sandoval could safely return, I am unable to conclude as a matter of law that there was an immediate need to accomplish this objective.  After all, Sandoval had already vacated the

-13-

Residence. In addition, based on information received from both eyewitnesses at the Residence and Sandoval, it is subject to dispute whether it was reasonable for the officers even to believe that they would find Martinez in the Residence. There are therefore outstanding issues regarding the presence of exigent circumstances that preclude a finding that Ford did not violate Lobato's Fourth Amendment rights by searching his bedroom on this basis.

Having concluded that Ford's actions in entering Lobato's bedroom may have violated his Fourth Amendment right to be free from unlawful searches, I must next determine whether the law was clearly established at the time such that a reasonable person in the Ford's position would have known that his conduct violated the law. Whether a particular constitutional right is clearly established at the time of the defendant's actions presents a "purely legal question," *Garrett*, 254 F.3d at 951 (*quoting Siegert v. Gilley*, 500 U.S. 26, 232 (1991), that must be analyzed in light of the specific context of the case, *Saucier*, 533 U.S. at 201. "Ordinarily for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Cruz v. City of Laramie, Wyo.,* 239 F.3d 1183, 1187 (10th Cir. 2001).

The case cited above in the analysis regarding Sandoval's voluntary consent to a search of the Residence, *U.S. v. Rith*, is a Tenth Circuit case decided well before the events at issue here. Further, the test enunciated in *Rith* for valid third party consent to a search was predicated on principles set forth in *U.S. v. Matlock,* 415 U.S. 164, 171 n.7 (1974) and *U.S. v. McAlpine,* 919 F. 1461, 1463

(10th Cir. 1990). Although *U.S. v. Cos* was decided after Lobato's shooting, its analysis of apparent authority to consent to a search was largely derived from *Illinois v. Rodriguez,* 497 U.S. 177 (1990) and *Rith*. Similarly, although, *U.S. v. Najar*, was decided after the events in questions here, it merely articulated a more narrow, two-part test for determining the existence of exigent circumstances. The prior three-part test that had been used in making this determination likewise required a showing that the law enforcement officers had reasonable grounds to believe that there was an immediate need to protect the lives of themselves or others. *See e.g. U.S. v. Smith,* 797 F.2d 836, 840 (10th Cir. 1986). I therefore conclude that the law was clearly established such that a reasonable person in Ford's position would have known that his conduct in entering Lobato's bedroom was in violation of his Fourth Amendment rights to be free from unlawful searches. Accordingly, I conclude that Ford is not entitled to summary judgment on Plaintiffs' Section 1983 claim based on an alleged unlawful search of Lobato's bedroom under the defense of qualified immunity.

### 2. The Shooting of Lobato

Claims of excessive force must be analyzed under the Fourth Amendment's standard of objective reasonableness. *Graham v. Connor,* 490 U.S. 386, 388 (1989). This standard requires a balancing of the individual's Fourth Amendment rights against the countervailing governmental interests at stake and requires careful attention to particular facts and circumstances, including the severity of the crime at issue, the nature of the threat presented to the officers or others, and the degree of resistance by the individual. *Id.* at 396. In cases involving deadly force, the use of such force is justified under the Fourth Amendment if a reasonable police officer would have had probable cause to believe that there was a threat of serious physical harm to the officer or to others. *Sevier v. City of Lawrence,* 60 F.3d 695, 699 (10th Cir. 1995).

-15-

Consideration of these factors and the evidence submitted in connection with Ford's motion for summary judgment demonstrates that there is clearly a triable issue as to whether Ford employed excessive force against Lobato in violation of his Fourth Amendment rights.  In particular, there are material disputes regarding precisely what transpired when the officers opened the door to Lobato's bedroom that preclude a determination at this stage that Ford's actions in shooting Lobato were objectively reasonable based on his purported belief that Lobato was armed and confrontational. Among other things, there is a genuine dispute as to whether Lobato had any object in his hands, said anything, or made any movement when the door was opened.  Plaintiffs have therefore met the first prong of the two-part test to defeat the Ford's assertion of qualified immunity for his actions in shooting Lobato.  The next question is whether the law was clearly established at the time such that a reasonable person in the Ford's position would have known that their conduct violated the law under the standards set forth above.  *Garrett, supra.*

Ford argues that Plaintiffs cannot satisfy their burden on this second prong of the test for qualified immunity because at the relevant point in time the law was clearly established that a law enforcement officer may use deadly force against a suspect later found to be unarmed.  The specific authority relied on by Ford in support of this argument, however, fails to justify the use of deadly force under the circumstances of this case.

First, in *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001), it was undisputed that the suspect victim told the officers on the scene that he had a gun and that he emerged from his residence with a staple gun wrapped in a towel that he intended to represent as a weapon.  These facts are in sharp contrast to the circumstances here where it is disputed whether Lobato had any object in is hands at all at the time of the shooting, let alone an object that could reasonably be perceived as a

weapon.  Likewise, both *Blossom v. Yarbrough,*, 429 F.3d 963 (10th Cir. 2005), and *Trusdale v. Bell,* 3002 WL 2303375 (10th Cir.), involved substantially different circumstances than those present in this case.  And, *Blossom* was decided after the events at issue here and therefore fails to establish the law at the applicable period of time, while *Trusdale* is an unpublished decision that has no precedential value.  *See* 10th Cir. R. 32.1.

In contrast, the law in the Tenth Circuit at the time Lobato was shot clearly established that the use of deadly force was justified only if a reasonable officer would have had probable cause to believe that there was a serious threat of physical harm to the officer or to others.  *Sevier*, 60 F.3d at 699.  Thus, accepting the facts in the light most favorable to Plaintiffs, the law was clearly established that a reasonable person in Ford's position would have known that his conduct in fatally shooting an unarmed, nondangerous person who was not a suspect in any crime violated the law. Accordingly, Ford is not entitled to summary judgment on Plaintiffs' Section 1983 claim based on the use of excessive force under the defense of qualified immunity.

## B.  Plaintiffs' Conspiracy Claims

Plaintiffs' response to Ford's motion for summary judgment clarifies that their claims against Ford under 42 U.S.C. § 1985 are predicated on two distinct alleged conspiracies: (1) Ford's alleged agreement with other officers to engage in conduct in entering and searching the Residence that was in reckless disregard or with deliberate indifference to Lobato's rights; and (2) Ford's alleged agreement with other officers to cover-up the unlawful shooting by manufacturing a defense based on a false representation that Lobato was holding a shiny can in his hand when the officers opened the door to his bedroom.  I conclude that Plaintiffs' claims under Section 1985 must fail with respect to both of these alleged conspiracies.

In order to prevail on a claim under Section 1985, Plaintiffs must prove the following elements: "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993). It is questionable at best that the evidence, direct and circumstantial, viewed in the light most favorable to Plaintiffs shows genuine issues of fact as to the existence of any conspiracy. But additionally, in order to prevail on a claim under Section 1985(3), which is the precise basis for Plaintiffs' conspiracy claims, a plaintiff must prove that the conspiracy was driven by a racial or class-based discriminatory animus. *Dixon v. City of Lawton,* 898 F.2d 1443, 1447 (10th Cir. 1990).

To establish that the alleged conspiracies against Lobato and Plaintiffs were motivated by racial or class-based animus, Plaintiffs rely on the following facts: (1) Lobato was a member of a minority group that has historically suffered from invidious discrimination; (2) Ford and the other officers knew that Lobato and all other persons in the Residence were Chicano/Mexican- Americans; and (3) the Denver Police Department's Early Identification and Intervention System ("EIIS") identified an excessive number of use of force incidents against minorities by Ford. The first two facts cited by Plaintiffs are insufficient in and of themselves to establish discriminatory animus on the part of Ford. Thus, the EIIS reports must provide sufficient evidence of such animus in order for Plaintiffs to defeat Ford's motion for summary judgment on their Section 1985(3) conspiracy claims.

Although Plaintiffs state that the EIIS identified an excessive number of use of force incidents against minorities by Ford, a review of the relevant documents fails to support this assertion. Instead, these documents merely reflect that Ford was involved in a total of 3 use of force incidents against persons of all races during the applicable time period and was therefore automatically subject to

-18-

review.  This evidence then does not support a conclusion that Ford was involved in an excessive number of use of force incidents against minorities.  Moreover, notably absent from the records relating to the use of force by Ford is evidence that any of these prior incidents involved people in the same ethnic minority or class as Plaintiffs or Lobato.  Under these circumstances, I conclude that Plaintiffs are unable to establish that the alleged conspiracies between Ford and the other officers were driven by racial or class-based animus.  Plaintiffs' claims against Ford under Section 1985 must therefore fail as a matter of law.

Although Ford also argues that he is entitled to summary judgment on a claim for conspiracy under Section 1983, Plaintiffs have not made such a claim.  Rather, Plaintiffs merely cite authority regarding conspiracies under Section 1983 to support their conspiracy claim under Section 1985 but that implicates a different standard.

## C.  Plaintiffs' Claim for Deprivation of the Familial Right of Association

Finally, Plaintiffs concede that *Trujillo v. Board of County Comm'ers,* 768 F.2d 1186 (10th Cir. 1985), as the controlling law of the Tenth Circuit, precludes any claim for deprivation of the familial right of association encompassed in either their Section 1983 or conspiracy claims.

For the reasons set forth above, IT IS HEREBY ORDERED that

1.  Defendant Ranjan Ford, Jr.'s Motion for Summary Judgment [Doc # 123] is GRANTED IN PART and DENIED IN PART;

2.  Plaintiffs' claim against Defendant Ford under 28 U.S.C. § 1983 for deprivation of the familial right of association is DISMISSED WITH PREJUDICE;

3.  Defendant Ford's Motion for Summary Judgment on Plaintiffs claims under 42 U.S.C. § 1983 based on an illegal search and use the use of excessive force is DENIED; and

4.  Plaintiffs' claims against Defendant Ford under 42 U.S.C. § 1985 are DISMISSED WITH PREJUDICE.

Dated: October ___31___, 2007 in Denver, Colorado.

                                          BY THE COURT:


                                          ___s/Lewis T. Babcock_____
                                          LEWIS T. BABCOCK, JUDGE