IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 05-cv-01437 - LTB - CBS

FRANCISCO JUAN LOBATO, individually and as the personal representative of the estate of
Frank Lobato;
ANTHONY LOBATO;
BARBARA LOBATO; and
RAMONA LOBATO,

   Plaintiffs,

v.

RANJAN FORD, JR., individually and as a Police Officer for the City and County of Denver;
JOSHUA HERRICK,  individually and as a Police Officer for the City and County of Denver;
GENE SHARLA, individually and as a Police Officer for the City and County of Denver;
ROBERT SHILLER,  individually and as a Police Officer for the City and County of Denver;
CHARLES KYLE, individually and as a Police Officer for the City and County of Denver;
STEVEN ADDISON, individually and as a Police Officer for the City and County of Denver;
JOHN and JANE DOES, Denver Police Officers whose true names and identities are unknown;
GERALD WHITMAN, Chief of Police of the City and County of Denver; and
THE CITY AND COUNTY OF DENVER, a municipal corporation,

   Defendants.

_____

ORDER
_____

   This case is before me on Defendants Joshua Herrick and Gene Sharla's Motion for

Summary Judgment [Doc # 121].  After consideration of the motion and all related pleadings, as

well as the case file, I grant the motion in part and deny it in part as set forth below.

**I.  Facts**

   The following facts are undisputed unless otherwise noted.  On July 11, 2004, Herrick,

Defendant Robert Shiller, and Jason Huff, all officers with the Denver Police Department, went to

the McDonald's restaurant located at 1350 West Colfax Avenue in response to a domestic

violence call by Cathy Sandoval.  Specifically, Sandoval reported that an individual named Vincent Martinez had beaten her and held her against her will for several hours at the residence they shared located at 1234 West 10th Avenue (the "Residence").

At the McDonald's restaurant, the officers observed physical injuries to Sandoval and determined that Martinez had two outstanding warrants for his arrest.  The warrants were apparently for failure to appear on a citation for public urination and for assault.  The officers also interviewed Sandoval who told them that she had last seen Martinez asleep on the couch in the Residence and that an uncle was also there.  The uncle that Sandoval was referring to was Frank Lobato who had apparently been living at the Residence for one to two weeks prior to July 11, 2004.  Plaintiffs assert that Sandoval further advised the officers at this time that Lobato was not involved in the assault that Martinez had inflicted upon her and that he was in an upstairs bedroom of the Residence.  Defendants have presented evidence, however, that contradicts this assertion.  In any event, it is clear that the responding officers were advised of the possible presence of a potentially innocent party at the Residence.  At this time, Sandoval also gave Shiller her consent to enter the Residence and indicated that she did not have keys to the Residence.

Officers Shiller, Herrick, and Huff went from the McDonald's restaurant to a location near the Residence where they were joined by Defendant Ranjan Ford, Jr.  The four officers discussed what had transpired and a generalized plan for how they planned to proceed.  The other officers also informed Ford at this time of the possible presence of an uncle at the Residence.  Although it is not entirely clear when Sharla joined the other officers, it is undisputed that he was not present for this conference which occurred away from the Residence.  Further, there is no evidence to contradict Sharla's assertion that he was not advised that a person other than Martinez might be

present at the Residence.

      The officers then went to the Residence where they knocked on the doors of the Residence and announced their presence but received no response.  The officers heard noises from inside the Residence though one or more witnesses told Herrick and Huff that they had seen a man possibly matching Martinez's description jump from a rear second story window.  Another witness indicated, however, that she had not seen anyone jump out of a rear second story window of the Residence despite having a clear view of the rear of the Residence at the relevant time.  There is no evidence to contradict Sharla's assertion that he was not informed that one or more witnesses claimed to have seen a man matching Martinez's description jump from a rear second story window.  In fact, Martinez had left the Residence by jumping out of the rear second story window shortly after the officers arrived on the scene.  At the time, all of the officers were positioned at the front of the Residence.

      Defendants Sharla, Herrick, and Ford, who were now positioned at the back of the Residence, discussed entering it through an open rear second story window.  Before the officers took any action, Shiller, who had remained at the front of the Residence, received an I-Call from Defendant Steven Addison, a police sergeant who was now at the McDonald's restaurant with Sandoval and Defendant Charles Kyle, another police sergeant who was also acting as lieutenant on this particular night.  The following exchange took place:

| | |
|---|---|
| Shiller: | ...we were able to get the shade open and there's nobody visible on the first floor. |
| ... | |
| Addison: | Then she doesn't think that he's there if he's not there sleeping on the couch. |

| | |
|---|---|
| Shiller: | OK, she doesn't think he'd be upstairs then? |
| Addison: | She said when they left, he was sleeping on the couch downstairs, so you would be able to see him if he was there, and if he's not there, then he's over at Nettie's. |
| Shiller: | OK, well, fire's still en route with a ladder.  Do you want us to just check that open window? |
| Addison: | Yeah, go ahead.  There should be an uncle in the house also, and he would be in one of the back bedrooms, so be careful. |
| Shiller: | Clear. |
| ... | |
| Addison: | ... we'll be over there in just a minute.  So, yeah, if there's an uncle in there, be careful. |
| Shiller: | OK, thanks. |

Shiller did not have any further communications with the other officers on the scene, including Herrick and Sharla, regarding Martinez or Lobato's presence in the Residence following this call.

Sometime after this I-Call, Addison and Kyle arrived on the scene and went to the back of the Residence which they were incorrectly advised had been covered at all times since the officers' arrival at the Residence.  Addison and Kyle concurred with and authorized Herrick, Ford, and Sharla's entry into the Residence through the open second story window using a ladder provided by the Denver Police Department.  Thereafter, approximately 40 minutes after the officers first arrived at the Residence, Ford, Herrick, and Sharla entered the Residence through the open rear second story window.  Just prior to the officers entry into the Residence, Sharla and possibly Herrick observed that dirt on an awning near the open window had been disturbed as though

someone had stepped on it.

Once inside the Residence, the officers cleared two of the three upstairs bedrooms and proceeded to the third bedroom where the door was closed. There, Herrick positioned himself directly across from the closed bedroom door; Sharla positioned himself by or in the bathroom to the right of the closed bedroom door; and Ford positioned himself by or on the stairwell to the left of the closed bedroom door. There is some dispute as to whether the officers announced their presence from their positions outside the closed bedroom door. In any event, Sharla reached across and opened this door. All three officers were then able to see into this room to some extent. Within a few seconds, at most, from when Sharla opened the door to the bedroom, Ford fired a single shot that struck and killed Lobato. Following the shooting, Ford's fellow officers heard him say that he thought Lobato had a gun.

Neither Herrick nor Sharla directed or counseled Ford to fire his weapon. Likewise, apart from knowing that Ford was armed, neither Herrick nor Sharla had notice that Ford would fire his weapon. Herrick and Sharla did not discharge their weapons or otherwise use any force against Lobato during the events which preceded his death.

Following the shooting, other officers on the scene entered the Residence by kicking in the doors. Shiller and Sharla carried Lobato's nude body down the stairs of the Residence, with Shiller supporting Lobato's upper body and Sharla supporting his lower body. According to Shiller and Sharla, they left Lobato's nude body at the bottom of the stairs by the front door inside the Residence so that emergency response personnel could have easy access to him. Eyewitnesses, however, claim that they saw police officers place Lobato's nude body on a stretcher outside the Residence where it was viewed by people in the neighborhood.

On August 5, 2005, the Manager of Safety for the City and County of Denver issued an order suspending Ford for 90 days based on his conclusions that Ford's actions on July 11, 2004 violated the Denver Police Department's Use of Force Policy and that Ford's assessment of the threat Lobato posed on that date was not objectively reasonable under the circumstances. Ford's suspension was subsequently reduced to 50 days as a result of a settlement agreement reached prior to the scheduled administrative appeal hearing. No other police officers were disciplined for their involvement in the events that occurred on July 11, 2004.

## II.  Standard for Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual

issue to be tried.  *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e).

These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule

56(c), except the pleadings themselves."  *Celotex*, 477 U.S. at 324.

      If a reasonable juror could not return a verdict for the non-moving party, summary

judgment is proper and there is no need for a trial.  *Celotex*, 477 U.S. at 323.  The operative

inquiry is whether, based on all documents submitted, reasonable jurors could find by a

preponderance of the evidence that the plaintiff is entitled to a verdict.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986).  However, summary judgment should not enter if, viewing

the evidence in a light most favorable to the nonmoving party and drawing all reasonable

inferences in that party's favor, a reasonable jury could return a verdict for that party.  *Id.* at 252;

*Mares*, 971 F.2d at 494.

### III.  Analysis

      In their First Amended Complaint, Plaintiffs assert claims against Herrick and Sharla

pursuant to 42 U.S.C. §§ 1983 & 1985.  Although it is somewhat unclear from Plaintiffs' First

Amended Complaint, Plaintiffs' response to Herrick and Sharla's motion for summary judgment

clarifies that their Section 1983 claim against these Defendants is predicated on their participation

in a purported unlawful search; their participation in the events that led to Ford's alleged use of

excessive force; and their failure to prevent the use of such force, all in violation of Lobato's

Fourth Amendment rights.  *See also Sacremento v. Lewis,* 523 U.S. 833, 842-3 (1998) (Because

alleged unlawful search and use of excessive force are specifically covered by the Fourth

Amendment, substantive due process standards do not apply).  Plaintiffs' Section 1983 claim

against Herrick and Sharla is also predicated on their alleged involvement in displaying Lobato's

nude body in public view following the fatal shooting and their failure to prevent such a public display, both in violation of Lobato's right to privacy.  Plaintiffs' response further clarifies that their Section 1985 claim against these Defendants is predicated on their role in purported conspiracies to unlawfully enter and search the Residence; to cover-up what occurred following this unlawful entry and thereby deprive Plaintiffs of their right of access to the courts; and to display Lobato's nude dead body in public view and thereby deprive him of his right to privacy.

By the motion, Herrick and Sharla argue that they cannot be held liable on Plaintiffs' Section 1983 claim because, at most, the evidence establishes negligence of their part and because they are entitled to qualified immunity.  Herrick and Sharla further argue that there is insufficient evidence to support Plaintiffs' conspiracy claims.

## A. The Scienter Requirement of Section 1983

Liability under Section 1983 cannot be predicated on negligence.  *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir. 1992), *cert. denied Woodard v. Seghetti,* 509 U.S. 923 (1993).  Rather, Section 1983 liability must be predicated on a deliberate deprivation of constitutional rights by the defendant.  *Id.*  Reckless intent may be sufficient to establish a violation of Section 1983.  *Medina v. City & County of Denver,* 960 F.2d 1493, 1496 (10th Cir. 1992).  "Reckless intent is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences."  *Id.*

Defendants argue that Plaintiffs cannot satisfy the scienter requirement of Section 1983 because they cannot establish recklessness or deliberate indifference on the part of Herrick and

Sharla.  In response, Plaintiffs assert that there are "mountains of evidence of recklessness and deliberate indifference" on the part of these Defendants but fail to specify any particular evidence that supports this assertion.  Instead, Plaintiffs direct my attention to the following generalized assertions of allegedly reckless conduct: (1) failure to call for a Metro Unit; (2) use of a second story window to enter the Residence; (3) failure to fully investigate whether Martinez had left the scene; (4) failure to develop plans and precautions to protect Lobato, a non-suspect known to be in the Residence; and (5) failure to intervene to protect Lobato.

Reviewing all the evidence submitted by the parties in the light most favorable to Plaintiffs, I conclude that there is sufficient but very slim evidence from which a jury could conclude that Herrick engaged in conduct that rose to the level of recklessness or deliberate indifference regarding Lobato's Fourth Amendment right to be free from an unreasonable search.  In particular, it is clear that Herrick knew that Lobato was likely to be present in the Residence and had reason to be skeptical that Martinez was also present there based on eyewitness statements and his knowledge that the back of the Residence was unattended for some period of time. Nonetheless, Herrick proceeded to enter the Residence and, accepting  Plaintiffs' version of the facts, approach the bedroom that housed Lobato with stealth.  Accordingly, I conclude that Plaintiffs have stated a claim under Section 1983 against Herrick unless the doctrine of qualified immunity is applicable.

But, I conclude that there is insufficient evidence to support a conclusion that Sharla engaged in conduct that rose to the level of recklessness or deliberate indifference regarding Lobato's constitutional rights.  Most significantly, there is no evidence that Sharla had any prior notice that Lobato was likely to be present in the Residence.  Further, the only evidence on record

to show that Sharla had any reason to doubt that the officers would find Martinez in the Residence is his possible observance of disturbed dirt on the awning near the open window through which the officers were entering the Residence.  This observation, standing alone, fails to establish that Sharla was aware of a substantial risk that made it highly probable that Lobato would suffer serous harm if the officers proceeded with their plan to enter the Residence and nonetheless proceeded to execute the plan in conscious and unreasonable disregard of the consequences.

I therefore conclude that Plaintiffs have failed to state a claim under Section 1983 against Sharla based on the alleged violations of Lobato's Fourth Amendment rights.  Because Plaintiffs' claim under Section 1983 based on an alleged violation of Lobato's right to privacy is predicated on entirely different facts and circumstances, however, Sharla is not entitled to summary judgment on this claim based on Plaintiffs' inability to establish the requisite intent.  My analysis of Defendants' claim of qualified immunity shall be limited accordingly.

## B.  The Doctrine of Qualified Immunity

The doctrine of qualified immunity shields governmental officials performing discretionary functions from liability for civil damages provided that their conduct does not violate clearly established constitutional rights.  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Once a defendant asserts the defense of qualified immunity, the plaintiff must establish that (1) the defendant's actions violated a constitutional or statutory right; and (2) the law was clearly established such that a reasonable person in the defendant's position would have known that their conduct violated the law.  *Garrett v. Stratman,* 254 F.3d 946, 951 (10th Cir. 2001). The threshold question is whether, taken in the light most favorable to the party asserting the

injury, the facts alleged show that the defendant's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If, and only if, the violation of a constitutional right can be established under such a view of the facts, the next sequential step is to determine whether the right was clearly established. *Id.*

I will now analyze sequentially, as I must, whether Plaintiffs can meet the two-part test with respect to Herrick's conduct at the Residence.

### 1. The Search of Lobato's Bedroom

As a preliminary matter, I must determine whether the opening of the door to Lobato's bedroom without prior notice as alleged by Plaintiffs and the viewing of it constitutes a "search" for purposes of the Fourth Amendment. A search under the Fourth Amendment "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984). Whether an individual has constitutionally protected reasonable expectation of privacy in a place is determined by two factors: "(1) whether the individual has manifested a subjective expectation of privacy in the object or place to be searched and (2) whether that expectation is one that society is prepared to recognize as reasonable." *Reeves v. Churchich,* 484 F.3d 1244, 1254 (10th Cir. 2007). "[T]he burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation." *United States v. Cavely,* 318 F.3d 987, 994 (10th Cir. 2003).

By closing the door to his bedroom, Lobato manifested a subjective expectation of privacy in this room. Further, "[i]t is well-settled that an individual has a reasonable expectation of privacy in the interior of one's home." *Reeves,* 484 F.3d at 1254. It is readily apparent then that Lobato had a reasonable expectation of privacy in his bedroom. The next question then is

whether Herrick infringed on that expectation by viewing the room after the door leading to it was opened by Sharla.

Although Herrick did not physically enter or intrude into Lobato's bedroom prior to the fatal shooting, "the reach of [the Fourth] Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Katz v. United States,* 389 U.S. 437, 353 (1967). In fact, there are numerous court opinions recognizing that a police officer's action in looking into a residence through a window or open door did not give rise to a search under the Fourth Amendment not because there was no physical entry but rather because the officer merely did what any member of the public was free to do. *See e.g. United States v. Taylor,* 90 F.3d 903, 908 (4th Cir. 1996) (law enforcement officers did not engage in search under the Fourth Amendment by looking through picture window adjacent to front door as anyone at the front entranceway of their home could have done). That is not the case here. Rather, Herrick and the other officers gained visual access to Lobato's bedroom in a manner not available to members of the public.

In sum then, I conclude that the officers' actions in opening the door to Lobato's bedroom and viewing it constituted a "search" under the Fourth Amendment. I must therefore proceed with an analysis of whether this search was in violation of Lobato's rights.

Although searches and seizures inside a home without a warrant are presumptively unreasonable, "one 'jealously and carefully drawn' exception recognizes the validity of searches with the voluntary consent of an individual possessing authority," including a fellow occupant who shares common authority over property when the other occupant is absent. *Georgia v. Randolph,* 547 U.S. 103, 109 (2006) (citations omitted).

Here, Herrick argues that the warrantless search of the Residence was lawful based on Sandoval's undisputed consent to the police officers' entry into the Residence. Plaintiffs argue, however, that the officers' entry into the Residence nonetheless violated Lobato's Fourth Amendment rights because as a houseguest or co-inhabitant of the Residence he had a legitimate expectation of privacy in his bedroom that Sandoval could not waive. In other words, Plaintiffs argue that Sandoval did not have authority to consent to a search of Lobato's bedroom.

In *U.S. v.Rith,* 164 F.3d 1323, 1329 (10th Cir. 1999), the Tenth Circuit held that a third party has the authority to consent to a search of property if that third party has either "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *See also U.S. v. Cos,* 498 F.3d 1115, 1125-26 (10th Cir. 2007) (recognizing that standards set forth in *Rith* control analysis of actual authority to consent to search of a residence). "Control for most purposes over property is a normative inquiry dependent on whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." *Rith,* 164 F.3d at 1330. Relationships which give rise to a presumption of control include that of parent-child and husband-wife but not that of simple co-tenants. *Id.* Accordingly, no presumption of control arises in this case based on Lobato's status as a houseguest or co-inhabitant of the Residence. In order to establish that Sandoval had the authority to consent to the search of Lobato's bedroom then, Herrick must show that Sandoval had mutual use of the bedroom by virtue of joint access.

"Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search." *Id.* at 1329-30. Here, Sandoval has given the following deposition

testimony about her use of Lobato's bedroom:

> Q: Now, as I understand it, Mr. Lobato also had a small television in his bedroom.
>
> A: Right.
>
> Q: Did he use that television at times?
>
> A: I would assume.  I don't know.  I never invaded his space.
>
> ...
>
> Q: Did he share the room with anybody even though they didn't stay there?  In other words, did your kids have things there in his room?  Did you have things in that room?
>
> A: Yes.
>
> Q: What things did you have in that room?
>
> A: I think just clothes were in the room for the kids and stuff.

This testimony suggests that Sandoval may have continued to make some use Lobato's bedroom but did not come and go freely from it.  With no other evidence currently before me regarding Sandoval's use of this bedroom, I am unable to make the requisite Rule 56 findings to support a conclusion that she had the authority to consent to the search of this bedroom notwithstanding her status as a named lessee of the Residence.

Even if Sandoval did not have actual authority to consent to the search of Lobato's bedroom, she may have had apparent authority to do so if the officers reasonably, but erroneously, believed that she had actual authority to consent.  *U.S. v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007).  The apparent authority inquiry is an objective one requiring a determination of whether "the facts available to the officer at the moment ... warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises."  *Id.* (*quoting Illinois v.*

*Rodriguez,* 497 U.S. 177, 188 (1990)).  The same standards set forth in *Rith* regarding actual

authority are applicable to this inquiry such that "a third party has apparent authority if the officer

has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint

access, or (2) control for most purposes over it.'" *Id.* (*quoting Rith,* 164 F.3d at 1329).

Arguably, Sandoval's undisputed status as an inhabitant of the Residence led the officers

to reasonably believe that she satisfied the *Rith* standards.  However, "where an officer is

presented with ambiguous facts relating to authority, he or she has a duty to investigate further

before relying on the consent." *Cos,* 498 F.3d at 1128  (*quoting U.S. v. Kimoana,* 383 F.3d

1215, 1222 (10th Cir. 2004).  Here, Herrick and other officers were advised of Lobato's presence

at the Residence but apparently made no effort to determine his status with respect to the

Residence, or any part of it, or whether his Fourth Amendment rights would be implicated by a

search of it.  Under these circumstances, and with no briefing on the issue of apparent authority

by any of the parties, I am unable to conclude that Sandoval had apparent authority to consent to

the search of Lobato's bedroom as a matter of law.

Accordingly, there are outstanding issues relating to Sandoval's consent to a search of

Lobato's bedroom that preclude a finding that Herrick did not violate Lobato's Fourth

Amendment rights by his search as a matter of law.  This result is consistent with the authority

that Herrick has cited in support of his assertion that there was no violation of Lobato's Fourth

Amendment rights based on the officers' entry into his bedroom.  First, Herrick cites *Georgia v.*

*Randolph,* 547 U.S. 103 (2006), for the proposition that the officers were not required to actively

solicit Lobato's permission to enter his bedroom when Sandoval, a co-tenant, had already given

her consent.  The question before me on Herrick's motion for summary judgment, however, is

-15-

whether Sandoval had the authority to give such consent based on her mutual use of this particular room by virtue of her joint access to it. *Rith*, 164 F.3d at 1329. *See also United States v. Matlock,* 425 U.S. 164, 171 n. 7 (1974) (third-party consent to a search is justified based on mutual use of the property by persons generally having joint access or control for most purposes).

Next, Herrick cites *United States v. Trotter,* 483 F.3d 694 (10h Cir. 2007) for the proposition that permission by Sandoval, as lessee, to search the Residence was fully effective against Lobato despite his concurrent Fourth Amendment interests.  Unlike the present case, however, *Trotter* involved the search of a storage unit as opposed to a home.  This distinction is significant because "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Minnesota v. Carter,* 525 U.S. 83, 89 (1998) (KENNEDY, J., concurring). *See also Cos,* 498 F.3d at 1128 (distinguishing *Trotter* largely on the basis that it did not involve the search of a home).  In addition, the Tenth Circuit based its conclusion in *Trotter* that there was valid third-party consent to the search of a storage unit both on the consenting party's status as a lessee of the unit and "his active participation in renting and using the facility." *Trotter*, 483 F.3d at 699.  Here, there are insufficient undisputed facts before me to support a finding that Sandoval made active use of the bedroom where Lobato was staying, and Herrick therefore cannot establish the criteria relied on by the Tenth Circuit in *Trotter* for valid third-party consent to a search in any event.

Having concluded that Herrick's actions in entering the bedroom where Lobato was staying may have violated his Fourth Amendment right to be free from an unlawful search, I must next determine whether the law was clearly established at the time such that a reasonable person

in his position would have known that his conduct violated the law.  Whether a particular constitutional right is clearly established at the time of the defendant's actions presents a "purely legal question," *Garrett*, 254 F.3d at 951 (*quoting Siegert v. Gilley,* 500 U.S. 26, 232 (1991), that must be analyzed in light of the specific context of the case, *Saucier*, 533 U.S. at 201.  "Ordinarily for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992).  "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity."  *Cruz v. City of Laramie, Wyo.,* 239 F.3d 1183, 1187 (10th Cir. 2001).

The case cited above in the analysis regarding Sandoval's voluntary consent to a search of the Residence, *U.S. v. Rith*, is a Tenth Circuit case decided well before the events at issue here.  Further, the test enunciated in *Rith* for valid third party consent to a search was predicated on principles set forth in *U.S. v. Matlock,* 415 U.S. at 171 n.7 (1974) and *U.S. v. McAlpine,* 919 F. 1461, 1463 (10th Cir. 1990).  Although *U.S. v. Cos* was decided after Lobato's shooting, its analysis of apparent authority to consent to a search was largely derived from *Illinois v. Rodriguez,* 497 U.S. 177 (1990) and *Rith*.  I therefore conclude that the law was clearly established that such that a reasonable person in Herrick's position would have known that his conduct in entering Lobato's bedroom was in violation of Lobato's Fourth Amendment right to be free from an unlawful search.  Accordingly, I conclude that Herrick is not entitled to summary judgment on Plaintiffs' Section 1983 claim based on an alleged unlawful search of the Lobato's bedroom under the defense of qualified immunity.

-17-

### 2. The Shooting of Lobato

Claims of excessive force must be analyzed under the Fourth Amendment's standard of objective reasonableness. *Graham v. Connor,* 490 U.S. 386, 388 (1989). This standard requires a balancing of the individual's Fourth Amendment rights against the countervailing governmental interests at stake and requires careful attention to particular facts and circumstances, including the severity of the crime at issue, the nature of the threat presented to the officers or others, and the degree of resistance by the individual. *Id.* at 396. In cases involving deadly force, the use of such force is justified under the Fourth Amendment if a reasonable police officer would have had probable cause to believe that there was a threat of serious physical harm to the officer or to others. *Sevier v. City of Lawrence,* 60 F.3d 695, 699 (10th Cir. 1995).

Consideration of these factors and the evidence submitted in connection with Herrick's motion for summary judgment demonstrates that there is clearly a triable issue as to whether Lobato was subjected to excessive force in violation of his Fourth Amendment rights. Herrick nonetheless argues that he cannot be held liable to Plaintiffs on this basis since he personally did not use any force against Lobato. Herrick further argues that he cannot be held liable to Plaintiffs for Ford's alleged use of excessive force against Lobato because he did not have an opportunity to intervene to prevent the shooting and because there is no causal link between his actions and Ford's shooting of Lobato.

A police officer who does not prevent a fellow officer's use of excessive force may be liable under Section 1983 if he had the opportunity to intervene but failed to do so. *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1433 (10th Cir. 1984), *vacated on other grounds,* 474 U.S. 805 (1985). Under this theory of liability, Plaintiffs argue that there are genuine issues of material fact

-18-

as to whether Herrick could have intervened to prevent the shooting of Lobato.  In this regard, Plaintiffs direct my attention to the fact that Herrick was present and in close proximity to Ford at the time of this shooting.  It is undisputed, however, that a few seconds, at most, passed from the time the door to Lobato's bedroom was opened to when the fatal shot was fired.  In fact, Plaintiffs themselves contend that "Ford fired his weapon instantaneously with the door being opened.  It did not even take a second."  It is further undisputed that Herrick had no prior notice of any plan by Ford to fire his weapon into the bedroom.  Under these circumstances, Plaintiffs have failed to raise a genuine issue of material fact as to whether either Herrick or Sharla had a realistic opportunity to intervene and prevent the shooting of Lobato.  *See Ting v. United States,* 927 F.2d 1504, 1511-12 (9th Cir. 1991) (non-shooting law enforcement agents could not be held liable to plaintiff where there was no evidence that they knew that the shooting agent would take such action and where the agents were physically incapable of preventing the shooting).

Plaintiffs further argue, however, that Herrick can be held liable for his participation in the chain of events that led to the shooting of Lobato.  Indeed, liability under Section 1983 can be predicated on direct participation in the deprivation of a constitutional right or on conduct that "[sets] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  *Guitierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 561(1st Cir. 1989).  *See also* 42 U.S.C. § 1983 (imposing liability on both those who subject a person to a deprivation of rights and those that cause a person to be subjected to a deprivation of rights).  Likewise, liability under Section 1983 has been predicated on an officer's conduct that was integral to the violation of another's rights. *See James v. Sadler,* 909 F.2d 834, 837 (5th Cir. 1990) (police officers backing up narcotics officers on raid who remained armed on

premises throughout search and who detained individuals present were participants rather than bystanders); *Melear v. Spears,* 862 F.2d 1177, 1186 (5th Cir. 1989) (deputy sheriff who stood armed at door while police officer conducted illegal search of residence could be held liable for integral participation in violation).

The question then is whether Herrick's conduct in entering and searching the Residence and then Lobato's bedroom is sufficient to support a finding that he subjected or caused Lobato to be subjected to excessive force in violation of his rights under the Fourth Amendment. Although the connection between Herrick's conduct in entering and searching the Residence and then the bedroom and Ford's shooting of Lobato is somewhat tenuous, I nonetheless conclude that there is sufficient evidence from which a jury could conclude that Herrick violated Lobato's right against the use of excessive force.

Having concluded that Herrick's conduct in entering and searching the Residence and then Lobato's bedroom may be sufficient to support a Section 1983 use of excessive force claim against him, I must next determine whether the law was clearly established at the time such that a reasonable person in Herrick's position would have known that his conduct violated the law. Again, this prong of the test for qualified immunity ordinarily requires a Supreme Court or Tenth Circuit decision on point or, alternatively, a weight of supporting authority from other courts.

The question here is not whether the law concerning the use of excessive force as utilized against Lobato is clearly established, but rather whether the law imposing liability on officers such as Herrick who did not personally use any force against the victim was clearly established. In this regard, the law in the Tenth Circuit was clearly established that a law enforcement officer who

fails to intervene to prevent another officer's use of excessive force may be liable under Section 1983. *Mick v. Brewer,* 76 F.3d 1127, 1136 (10th Cir. 1996). As set forth above, however, my conclusion that Herrick may be liable under Section 1983 for use of excessive force against Lobato was predicated not on his failure to intervene but rather on his participation in the chain of events that led to the fatal shooting. On this issue, Plaintiffs have failed to identify any Supreme Court or Tenth Circuit authority on point and instead rely primarily on *Strachan v. City of Federal Heights,* 837 F. Supp, 1036 (D. Colo. 1993) to establish Herrick's liability.

In *Strachan,* the district court concluded that it would be inappropriate to enter summary judgment in favor of law enforcement officers who did not personally employ excessive force based on expert testimony that the entire police operation was substandard and likely to result in a shooting. In reaching this conclusion, the district court relied on *Guitierrez-Rodriguez v. Cartagena,* 882 F.2d 553(1st Cir. 1989) and *Grandstaff v. Borger,* 767 F.2d 161 (5th Cir. 1985). These cases, however, are distinguishable from both *Strachan* and the present case in that the defendant officers in *Cartegena* and *Grandstaff* all fired their weapons at the victim of excessive force and thereby acted in concert with the actual shooter. In view of these unique circumstances, Plaintiffs cannot establish that there is a weight of authority from courts other than the Supreme Court and Tenth Circuit establishing that police officers who do not personally use excessive force but merely participate in the events leading up to the use of force can be held liable for the use of such force.

Likewise, although there is Fifth Circuit authority suggesting that Herrick could be held liable for the use of excessive force if he engaged in conduct that was integral to the violation of another's rights, other courts have rejected this analysis. *See e.g. Howard v. Schoberle,* 907 F.

Supp. 671, 682 (S.D.N.Y. 1995) (declining to follow Fifth Circuit authority that officers serving as back-up to search team who were present during search could be considered active participants in that activity).  Moreover, neither *James* nor *Melear* is on point since both of these cases involved illegal searches as opposed to illegal seizures through the use of excessive force.

Under these circumstances, I conclude that the law pursuant to which a jury could find Herrick liable for the use of excessive force was not sufficiently established such that a reasonable person in Herrick's position would have known that his conduct constituted the law. Accordingly, I find and conclude that Plaintiffs' Section 1983 claim against Herrick based on the use of excessive force is precluded by the doctrine of qualified immunity.

### 3.  The Handling of Lobato's body

Although not explicitly mentioned in the Constitution, the Supreme Court has repeatedly recognized that there is a constitutional right to privacy.  *See e.g. Carey v. Population Serv., Int'l,* 431 U.S. 678, 684 (1977).  Plaintiffs assert that Lobato's right to privacy was violated by Herrick and Sharla's post-shooting conduct in failing to cover Lobato's nude body and in placing his nude body where it could be viewed by the public, as well as by their failure to intervene to prevent the display of Lobato's nude body.

In support of their right to privacy claim, Plaintiffs baldly assert "[t]hat a person has a clearly established constitutional privacy right in having their unclothed body seized and placed in the open view of the entire neighborhood is so fundamental that it needs little citation to authority."  Response, p. 28.  Indeed, Plaintiffs cite but one Tenth Circuit case involving a right to privacy claim based on the viewing of a nude or semi-nude body.  Therein, the Tenth Circuit merely stated:

> Although the frequency of such practices is important, ... the plaintiff's statement that male inmates were subject to a "certain amount of viewing" by female guards does not necessarily fall short of a cognizable constitutional claim. The district court thus erred in dismissing the entire action as frivolous.

*Cumby v. Meachum,* 684 F.2d 712, 714 (10th Cir. 1982) (*per curium*). Nonetheless, Plaintiffs argue that Herrick and Sharla's conduct in the handling of Lobato's body following the shooting was so egregious that the unlawfulness of this conduct was readily apparent despite the lack of authority on point. I disagree. Furthermore, even if I was to conclude that there is a triable issue as to whether Herrick and Sharla's conduct in failing to cover Lobato's body and in placing it where it could be viewed by the public violated Lobato's right to privacy, Plaintiffs are wholly unable to satisfy the second prong of the qualified immunity test; that is, that the law was clearly established such that a reasonable person in Herrick and Sharla's position would have known that their conduct violated Lobato's right to privacy.

Plaintiffs attempt to circumvent the lack of authority directly on point by reliance on *Hope v. Pelzer,* 536 U.S. 730, 741 (2002), wherein the Supreme Court recognized that governmental officials may still be on notice that their conduct violates the law in novel factual circumstances. In any event, analysis of whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 202. Here, Plaintiffs are unable to identify any authority recognizing a violation of privacy right under facts even remotely similar to those present here. I therefore conclude that the law regarding the right to privacy was not sufficiently established such that a reasonable person in the position of these Defendants would have known that their conduct violated this right. Accordingly, I further find and conclude that Plaintiffs' Section 1983 claim against Herrick and Sharla based their

alleged violation of Lobato's right to privacy is precluded by the doctrine of qualified immunity.

**C.  Plaintiffs' Section 1985 Conspiracy Claims**

Plaintiffs' response to Herrick and Shiller's motion for summary judgment clarifies that their claims against these Defendants under 42 U.S.C. § 1985 are predicated on three distinct alleged conspiracies: (1) Herrick and Sharla's alleged agreement with other officers to engage in conduct in entering and searching the Residence that was in reckless disregard or with deliberate indifference to Lobato's rights; (2) Herrick and Sharla's alleged agreement with other officers to cover-up the unlawful shooting by manufacturing a defense based on a false representation that Lobato was holding a shiny can in his hand when the officers opened the door to his bedroom; and (3) Herrick and Sharla's alleged agreement with other officers to display Lobato's nude body in public view.  I conclude that Plaintiffs' claims against these Defendants under Section 1985 must fail with respect to all of these alleged conspiracies.

In order to prevail on a claim under Section 1985, Plaintiffs must prove the following elements: "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993).  It is questionable at best that the evidence, direct and circumstantial, viewed in the light most favorable to Plaintiffs shows genuine issues of fact as to the existence of any conspiracy.  But additionally, in order to prevail on a claim under Section 1985(3), which is the precise basis for Plaintiffs' conspiracy claims, a plaintiff must prove that the conspiracy was driven by a racial or class-based discriminatory animus. *Dixon v. City of Lawton,* 898 F.2d 1443, 1447 (10th Cir. 1990).

To establish that the alleged conspiracies against Lobato and Plaintiffs were motivated by

racial or class-based animus, Plaintiffs rely on the following facts: (1) Lobato was a member of a minority group that has historically suffered from invidious discrimination; (2) Ford and the other officers knew that Lobato and all other persons in the Residence were Chicano/Mexican-Americans; and (3) the Denver Police Department's Early Identification and Intervention System ("EIIS") identified an excessive number of use of force incidents against minorities by Ford. The first two facts cited by Plaintiffs are insufficient in and of themselves to establish discriminatory animus on the part of Defendants. Thus, the EIIS reports must provide sufficient evidence of such animus in order for Plaintiffs to defeat Herrick and Sharla's motion for summary judgment on their Section 1985(3) conspiracy claims.

The EIIS reports do not relate in any way to either Herrick or Sharla. Plaintiffs nonetheless assert that these reports are sufficient to establish the requisite discriminatory animus because they demonstrate an excessive number of use of force incidents against minorities by Ford, a co-conspirator. A review of the related documents, however, fails to support this assertion. Instead, these documents merely reflect that Ford was involved in a total of 3 use of force incidents against persons of all races during the applicable time period and was therefore automatically subject to review. This evidence then does not support a conclusion that Ford was involved in an excessive number of use of force incidents against minorities. Moreover, notably absent from the records relating to the use of force by Ford is evidence that any of these prior incidents involved people in the same ethnic minority or class as Plaintiffs or Lobato. Under these circumstances, I conclude that Plaintiffs are unable to establish that the alleged conspiracies between Herrick, Sharla, and other officers were driven by racial or class-based animus. Plaintiffs' claims against Herrick and Sharla under Section 1985 must therefore fail as a matter of

law.

Although Herrick and Sharla also argue that they are entitled to summary judgment on a claim for conspiracy under Section 1983, Plaintiffs have not made such a claim.  Rather, Plaintiffs merely cite authority regarding conspiracies under Section 1983 to support their conspiracy claim under Section 1985 but that implicates a different standard.

**D. Plaintiffs' Claim Under 42 U.S.C. § 1986**

Curiously, although their First Amended Complaint only states claims against Herrick and Shiller pursuant to Sections 1983 & 1985, Plaintiffs now assert that these defendants are also liable to them under 42 U.S.C. § 1986 as a result of their alleged failure to intervene to prevent the conspiracies that purportedly occurred in violation of Section 1985.  Plaintiffs cannot, however,  inject a new claim into this case by way of a response to a summary judgment.  Since I have already rejected Plaintiffs' argument that there is sufficient evidence to go to trial on a conspiracy claim under Section 1985, there is no basis for this claim in any event.  *See e.g. Grimes v. Smith,* 776 F.2d 1359 (7th Cir. 1985) (claim under Section 1986 must be supported by valid claim under Section 1985).

**E.  Plaintiffs' Claim for Deprivation of the Familial Right of Association**

Finally, Plaintiffs concede that *Trujillo v. Board of County Comm'ers,* 768 F.2d 1186 (10th Cir. 1985), as the controlling law of the Tenth Circuit, precludes any claim for deprivation of the familial right of association encompassed in either their Section 1983 or conspiracy claims.

For the reasons set forth above, IT IS ORDERED that

1. Defendants Joshua Herrick and Gene Sharla's Motion for Summary Judgment [Doc # 121] is GRANTED IN PART and DENIED IN PART;

2.  Plaintiffs' claims against Defendant Gene Sharla under 42 U.S.C. § 1983 are hereby DISMISSED WITH PREJUDICE;

3.  Plaintiffs' claims against Defendant Joshua Herrick under 42 U.S.C. § 1983 based on the use of excessive force; violation of the right to privacy; and deprivation of the familial right of association are hereby DISMISSED WITH PREJUDICE;

4.  Defendant Joshua Herrick's Motion for Summary Judgment on Plaintiffs' claim under 42 U.S.C. § 1983 based on an illegal search is DENIED; and

5.  Plaintiffs' claims against Defendants Joshua Herrick and Gene Sharla under 42 U.S.C. § 1985 are hereby DISMISSED WITH PREJUDICE.


Dated: October ___31___, 2007 in Denver, Colorado.

BY THE COURT:


___s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE