IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 05-cv-01437 - LTB - CBS

FRANCISCO JUAN LOBATO, individually and as the personal representative of the estate of
Frank Lobato;
ANTHONY LOBATO;
BARBARA LOBATO; and
RAMONA LOBATO,

       Plaintiffs,

v.

RANJAN FORD, JR., individually and as a Police Officer for the City and County of Denver;
JOSHUA HERRICK,  individually and as a Police Officer for the City and County of Denver;
GENE SHARLA, individually and as a Police Officer for the City and County of Denver;
ROBERT SHILLER,  individually and as a Police Officer for the City and County of Denver;
CHARLES KYLE, individually and as a Police Officer for the City and County of Denver;
STEVEN ADDISON, individually and as a Police Officer for the City and County of Denver;
JOHN and JANE DOES, Denver Police Officers whose true names and identities are unknown;
GERALD WHITMAN, Chief of Police of the City and County of Denver; and
THE CITY AND COUNTY OF DENVER, a municipal corporation,

       Defendants.

_____

ORDER
_____

       This case is before me on Defendant Robert Shiller's Motion for Summary Judgment

Based on Qualified Immunity [Doc # 61].  After consideration of the motion and all related

pleadings, as well as the case file, I grant the motion as set forth below.

## I.  Facts

       The following facts are undisputed unless otherwise noted.  On July 11, 2004, Shiller,

Defendant Joshua Herrick, and Jason Huff, all officers with the Denver Police Department, went

to the McDonald's restaurant located at 1350 West Colfax Avenue in response to a domestic

violence call by Cathy Sandoval.  Specifically, Sandoval reported that an individual named Vincent Martinez had beaten her and held her against her will for several hours at the residence they shared located at 1234 West 10th Avenue (the "Residence").

At the McDonald's restaurant, the officers observed physical injuries to Sandoval and determined that Martinez had two outstanding warrants for his arrest.  The warrants were apparently for failure to appear on a citation for public urination and for assault.  The officers also interviewed Sandoval who told them that she had last seen Martinez asleep on the couch in the Residence and that an uncle was also there.  The uncle that Sandoval was referring to was Frank Lobato who had apparently been living at the Residence for one to two weeks prior to July 11, 2004.  Plaintiffs assert that Sandoval further advised the officers at this time that Lobato was not involved in the assault that Martinez had inflicted upon her and that he was in an upstairs bedroom of the Residence.  Defendants have presented evidence, however, that contradicts this assertion.  In any event, it is clear that the responding officers were advised of the possible presence of a potentially innocent party at the Residence.  At this time, Sandoval also gave Shiller her consent to enter the Residence and indicated that she did not have keys to the Residence.

Officers Shiller, Herrick, and Huff went from the McDonald's restaurant to a location near the Residence where they were joined by Defendant Ranjan Ford, Jr.  The four officers discussed the situation at hand, and Shiller advised the other officers that an uncle might also be present at the Residence.  The four officers then went to the Residence where they were joined by Defendant Gene Sharla.

There is some dispute between the parties regarding the role that Shiller played in the events that followed.  In this regard, Plaintiffs have presented the affidavits of  H. Ellis Armistead

and Louis Mayo, two designated experts in the field of police procedures, in support of their

argument that Shiller "directed and otherwise assumed supervisory responsibilities" for the

conduct of the officers at the Residence.  Specifically, Armistead opined that "while not a

supervisor *per se,*" Shiller "appears ... to have been coordinating the activities at the scene, prior

to the arrival of a supervisor and as the officers prepared to enter the home."  Mayo similarly

opined that Shiller "was in charge of the investigation until [Defendants] Addison and Kyle

arrived" and "grossly failed to properly supervise" the events at the Residence.  For purposes of

Shiller's motion, I will assume that the opinions of Armistead and Mayo accurately reflect

Shiller's role in the events at the Residence.

The officers knocked on the doors of the Residence and announced their presence but

received no response.  The officers heard noises from inside the Residence though one or more

witnesses told them that they had seen a man possibly matching Martinez's description jump from

a rear second story window jump from a rear second story window.  Another witness indicated,

however, that she had not seen anyone jump out of a rear second story window of the Residence

despite having a clear view of the rear of the Residence at the relevant time.  In fact, Martinez had

left the Residence by jumping out of the rear second story window shortly after the officers

arrived on the scene.  At the time, all of the officers were positioned at the front of the Residence.

Defendants Sharla, Herrick, and Ford, who were now positioned at the back of the

Residence, discussed entering it through an open rear second story window.  Before the officers

took any action, Shiller, who had remained at the front of the Residence, received an I-Call from

Defendant Steven Addison, a police sergeant who was now at the McDonald's restaurant with

Sandoval and Defendant Charles Kyle, another police sergeant who was also acting as lieutenant

on this particular night.  The following exchange took place:

| | |
|---|---|
| Shiller: | ...we were able to get the shade open and there's nobody visible on the first floor. |

... 

| | |
|---|---|
| Addison: | Then she doesn't think that he's there if he's not there sleeping on the couch. |
| Shiller: | OK, she doesn't think he'd be upstairs then? |
| Addison: | She said when they left, he was sleeping on the couch downstairs, so you would be able to see him if he was there, and if he's not there, then he's over at Nettie's. |
| Shiller: | OK, well, fire's still en route with a ladder.  Do you want us to just check that open window? |
| Addison: | Yeah, go ahead.  There should be an uncle in the house also, and he would be in one of the back bedrooms, so be careful. |
| Shiller: | Clear. |

...

| | |
|---|---|
| Addison: | ... we'll be over there in just a minute.  So, yeah, if there's an uncle in there, be careful. |
| Shiller: | OK, thanks. |

Shiller did not have any further communications with the other officers on the scene regarding

Martinez or Lobato's presence in the Residence following this call.

Sometime after this I-Call, Addison and Kyle arrived at the Residence.  Addison and Kyle

went to the back of the Residence where they concurred with and authorized Herrick, Ford, and

Sharla's entry into the Residence through the open rear second story window using a ladder

provided by the Denver Fire Department.  Thereafter, approximately 40 minutes after the officers first arrived at the Residence, Herrick, Ford, and Sharla entered the Residence through the open rear second story window while Shiller remained positioned at the front of the Residence.

Once inside the Residence, the officers cleared two of the three upstairs bedrooms and proceeded to the third bedroom where the door was closed.  There, Herrick positioned himself directly across from the closed bedroom door; Sharla positioned himself by or in the bathroom to the right of the closed bedroom door; and Ford positioned himself by or on the stairwell to the left of the closed bedroom door.  Sharla then reached across and opened the closed bedroom door.  Within a few seconds, at most, from when Sharla opened the door to the bedroom, Ford fired a single shot that struck and killed Lobato.  Following the shooting, Ford's fellow officers heard him say that he thought Lobato had a gun.

After hearing the gun shot fired by Ford, Shiller entered the Residence by kicking in the front door while Addison and Kyle entered the Residence by kicking in the rear door.  Shiller and Sharla carried Lobato's nude body down the stairs of the Residence, with Shiller supporting Lobato's upper body and Sharla supporting his lower body.  According to Shiller and Sharla, they left Lobato's nude body at the bottom of the stairs by the front door inside the Residence so that emergency response personnel could have easy access to him.  Eyewitnesses, however, claim that they saw police officers place Lobato's nude body on a stretcher outside the Residence where it was viewed by people in the neighborhood.

On August 5, 2005, the Manager of Safety for the City and County of Denver issued an order suspending Ford for 90 days based on his conclusions that Ford's actions on July 11, 2004 violated the Denver Police Department's Use of Force Policy and that Ford's assessment of the

threat Lobato posed on that date was not objectively reasonable under the circumstances.  Ford's suspension was subsequently reduced to 50 days as a result of a settlement agreement reached prior to the scheduled administrative appeal hearing.  No other police officers were disciplined for their involvement in the events that occurred on July 11, 2004.

## II.  Standard for Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The non-moving party has the burden of showing that there are issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial.  *Celotex*, 477 U.S.  at 323;  *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.  *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e).  These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves."  *Celotex*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares*, 971 F.2d at 494.

### III. Analysis

In their First Amended Complaint, Plaintiffs assert claims against Shiller pursuant to 42 U.S.C. §§ 1983 & 1985. Although it is somewhat unclear from Plaintiffs' First Amended Complaint, Plaintiffs' responses to the various summary judgment motions that have been filed in this case clarify that their Section 1983 claim against Shiller is predicated on his involvement in a purported unlawful search; his involvement in the chain of events that led to the alleged use of excessive force; and his failure to prevent the use of such force, all in violation of Lobato's Fourth Amendment rights. *See also Sacremento v. Lewis,* 523 U.S. 833, 842-3 (1998) (Because alleged unlawful search and use of excessive force are specifically covered by the Fourth Amendment, substantive due process standards do not apply). Plaintiffs' Section 1983 claim against Shiller is also apparently predicated on his alleged involvement in displaying Lobato's nude body in public view following the fatal shooting and his failure to prevent such a public display, both in violation of Lobato's right to privacy. Plaintiffs' responses further clarify that their Section 1985 claim against Shiller is predicated on his role in purported conspiracies to unlawfully enter and search

the Residence; to cover-up what occurred following this unlawful entry and thereby deprive Plaintiffs of their right of access to the courts; and to display Lobato's nude dead body in public view and thereby deprive him of his right to privacy.

By the motion, Shiller argues that he cannot be held liable to Plaintiffs on these claims based on the doctrine of qualified immunity. Shiller further argues that there is insufficient evidence to support Plaintiffs' conspiracy claims. I agree that Plaintiffs' claims against Shiller fail as a matter of law.

## A.  The Doctrine of Qualified Immunity

The doctrine of qualified immunity shields governmental officials performing discretionary functions from liability for civil damages provided that their conduct does not violate clearly established constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Once a defendant asserts the defense of qualified immunity, the plaintiff must establish (1) that the defendant's actions violated a constitutional or statutory right; and (2) that the law was clearly established such that a reasonable person in the defendant's position would have known that their conduct violated the law. *Garrett v. Stratman,* 254 F.3d 946, 951 (10th Cir. 2001).

The threshold question is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendant's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If, and only if, the violation of a constitutional right can be established under such a view of the facts, the next sequential step is to determine whether the right was clearly established. *Id.*

I will now analyze sequentially, as I must, whether Plaintiffs can meet the two-part test with respect to Shiller's conduct at the Residence.

**1.  The Search of Lobato's Bedroom**

Shiller did not enter the Residence until after the shooting of Lobato and therefore did not personally participate in a search of Lobato's bedroom.  Further, although Armistead and Mayo have opined that Shiller played some role in supervising the events at the Residence, both of these experts concede that this role ended once Addison and Kyle arrived on the scene.  Since Addison and Kyle arrived on the scene prior to the other officers' entry into the Residence and admittedly authorized this course of action, there is no basis on which to impose supervisory liability on Shiller.  *See Serna v. Colo. Dept. of Corrections,* 455 F.3d 1146 (10th Cir. 2006) (setting forth standards for supervisory liability under Section 1983).  Consequently, Shiller's liability for the alleged illegal search of Lobato's bedroom must be predicated on the police functions that Shiller performed outside the Residence.  I must first determine, however, whether Plaintiffs can show a genuine issue of material fact as to whether there was an illegal search of Lobato's bedroom.

A search under the Fourth Amendment "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).  Whether an individual has constitutionally protected reasonable expectation of privacy in a place is determined by two factors: "(1) whether the individual has manifested a subjective expectation of privacy in the object or place to be searched and (2) whether that expectation is one that society is prepared to recognize as reasonable." *Reeves v. Churchich,* 484 F.3d 1244, 1254 (10th Cir. 2007).  "[T]he burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation." *United States v. Cavely,* 318 F.3d 987, 994 (10th Cir. 2003).

By closing the door to his bedroom, Lobato manifested a subjective expectation of privacy

in his bedroom.  Further, "[i]t is well-settled that an individual has a reasonable expectation of

privacy in the interior of one's home." *Reeves,* 484 F.3d at 1254.  Under these circumstances, it

is readily apparent that Lobato had a reasonable expectation of privacy in the room where he was

staying.  The next question then is whether the officers, specifically Herrick and Ford, infringed on

that expectation by opening the door to Lobato's bedroom and firing a shot into it.  This question

must be answered in the affirmative based both on the physical intrusion into this room by the

bullet fired from Ford's weapon as well as the officers' viewing of this room in a manner not

available to members of the public.  *Compare United States v. Taylor,* 90 F.3d 903, 908 (4th Cir.

1996) (law enforcement officers did not engage in search under the Fourth Amendment by

looking through picture window adjacent to front door as anyone at the front entranceway of

their home could have done).  I therefore conclude that the officers conducted a search of

Lobato's bedroom and must next analyze whether this search was in violation of his Fourth

Amendment rights.

Although searches and seizures inside a home without a warrant are presumptively

unreasonable, "one 'jealously and carefully drawn' exception recognizes the validity of searches

with the voluntary consent of an individual possessing authority," including a fellow occupant

who shares common authority over property when the other occupant is absent.  *Georgia v.

Randolph,* 547 U.S. 103, 109 (2006) (citations omitted).

Here, Shiller argues that the warrantless search of the Residence was lawful based on

Sandoval's undisputed consent to the police officers' entry into the Residence.  Plaintiffs argue,

however, that the officers' search of Lobato's bedroom nonetheless violated his Fourth

Amendment rights because as a houseguest or co-inhabitant of the Residence he had a legitimate

expectation of privacy in his bedroom that Sandoval could not waive.  In other words, Plaintiffs argue that Sandoval did not have authority to consent to a search of Lobato's bedroom.

In *U.S. v.Rith,* 164 F.3d 1323, 1329 (10th Cir. 1999), the Tenth Circuit held that a third party has the authority to consent to a search of property if that third party has either "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."  "Control for most purposes over property is a normative inquiry dependent on whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." *Id.* at 1330.  Relationships which give rise to a presumption of control include that of parent-child and husband-wife but not that of simple co-tenants. *Id.*  Accordingly, no presumption of control arises in this case based on Lobato's status as a houseguest or co-inhabitant of the Residence.  In order to establish that Sandoval had the authority to consent to the search of Lobato's bedroom then, Shiller must show that Sandoval had mutual use of the bedroom by virtue of joint access.

"Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search." *Id.* at 1329-30.  Here, Sandoval has given the following deposition testimony about her use of the bedroom where Lobato was staying:

Q: Now, as I understand it, Mr. Lobato also had a small television in his bedroom.

A: Right.

Q: Did he use that television at times?

A: I would assume.  I don't know.  I never invaded his space.

...

-11-

Q: Did he share the room with anybody even though they didn't stay there?  In other words, did your kids have things there in his room?  Did you have things in that room?

A: Yes.

Q: What things did you have in that room?

A: I think just clothes were in the room for the kids and stuff.

This testimony suggests that Sandoval may have continued to make some use of Lobato's bedroom but did not come and go freely from it.  With no other evidence currently before me regarding Sandoval's use of this bedroom, I am unable to make the requisite factual findings to support a conclusion that she had the authority to consent to the search of this bedroom notwithstanding her status as a named lessee of the Residence.

Even if Sandoval did not have actual authority to consent to the search of Lobato's bedroom, she may have had apparent authority to do so if the officers reasonably, but erroneously, believed that she had actual authority to consent.  *U.S. v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007).  The apparent authority inquiry is an objective one requiring a determination of whether "the facts available to the officer at the moment ... warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises." *Id.* (*quoting Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990)).  The same standards set forth in *Rith* regarding actual authority are applicable to this inquiry such that "a third party has apparent authority if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" *Id.* (*quoting Rith,* 164 F.3d at 1329).

Arguably, Sandoval's undisputed status as an inhabitant of the Residence led the officers

-12-

to reasonably believe that she satisfied the *Rith* standards.  However, "where an officer is

presented with ambiguous facts relating to authority, he or she has a duty to investigate further

before relying on the consent."  *Cos*, 498 F.3d at 1128  (*quoting U.S. v. Kimoana,* 383 F.3d

1215, 1222 (10th Cir. 2004).  Here, the officers were advised of Lobato's presence at the

Residence but apparently made no effort to determine his status with respect to the Residence, or

any part of it, or whether his Fourth Amendment rights would be implicated by a search of it.

Under these circumstances, and with no briefing on the issue of apparent authority by any of the

parties, I am unable to conclude that Sandoval had apparent authority to consent to the search of

Lobato's bedroom as a matter of law.

      Accordingly, I conclude that Plaintiffs have satisfied their burden of showing that some of

the defendant officers may have violated Lobato's Fourth Amendment rights by searching his

bedroom.  The next question then is whether Shiller, who remained outside the Residence during

the course of this search in a non-supervisory role, may also be held liable for it.  There is some

support for liability under Section 1983 under the circumstances here.  Notably, liability under

Section 1983 can be predicated on conduct that "[sets] in motion a series of acts by others which

the actor knows or reasonably should know would cause others to inflict the constitutional

injury." *Guitierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 561(1st Cir. 1989).  *See also* 42

U.S.C. § 1983 (imposing liability on both those who subject a person to a deprivation of rights

and those that cause a person to be subjected to a deprivation of rights).  Likewise, liability under

Section 1983 has been predicated on an officer's conduct that was integral to the violation of

another's rights. *See James v. Sadler,* 909 F.2d 834, 837 (5th Cir. 1990) (police officers backing

up narcotics officers on raid who remained armed on premises throughout search and who

detained individuals present were participants rather than bystanders); *Melear v. Spears,* 862 F.2d 1177, 1186 (5th Cir. 1989) (deputy sheriff who stood armed at door while police officer conducted illegal search of residence could be held liable for integral participation in violation).

I must now determine whether Shiller's conduct in coordinating the police operations at the Residence for some period of time prior to the search of Lobato's bedroom either set in motion a series of acts which he knew or reasonably should have known would cause a violation of Lobato's Fourth Amendment right to be free illegal searches or was integral to the violation of this right. Because any causal connection between Shiller's conduct and the search was necessarily broken, I conclude that this question must be answered in the negative. Although I need not address the second prong of the test for qualified immunity, out of an abundance of caution, I will assume for purposes of this Order that Shiller's conduct arguably caused Lobato to be subjected to an illegal search in violation of his Fourth Amendment rights and that he may therefore be liable to Plaintiffs for this search.

The next prong of the test for qualified immunity requires Plaintiffs to establish that the law imposing liability on a law enforcement officer such as Shiller whose supervisory role was extinguished by higher ranking officers and who did not directly participate in the violation of a constitutional right was clearly established at the time such that a reasonable person in Shiller's position would have known that his conduct violated the law. Whether a particular constitutional right is clearly established at the time of the defendant's actions presents a "purely legal question," *Garrett*, 254 F.3d at 951 (*quoting Siegert v. Gilley,* 500 U.S. 26, 232 (1991)), that must be analyzed in light of the specific context of the case, *Saucier*, 533 U.S. at 201. "Ordinarily for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point,

or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Cruz v. City of Laramie, Wyo.,* 239 F.3d 1183, 1187 (10th Cir. 2001).

I recognized First and Fifth Circuit case law that could arguably support a conclusion that Shiller's conduct in relation to the search of Lobato's bedroom may constitute a violation of Lobato's constitutional rights. Plaintiffs have, however, failed to identify any Supreme Court or Tenth Circuit authority on point. I further note that other courts have rejected the Fifth Circuit's analysis that a law enforcement officer can be held liable for the violation of a constitutional right if they merely engaged in conduct that was integral to that violation. *See e.g. Howard v. Schoberle,* 907 F. Supp. 671, 682 (S.D.N.Y. 1995) (expressly rejecting the Fifth Circuit's analysis in *Sadler* and *Melear*). Plaintiffs have therefore failed to establish that there is either Supreme Court authority, Tenth Circuit authority, or a  weight of authority from other courts such that a reasonable person in Shiller's shoes would have known that his conduct in relation to the search of Lobato's bedroom was illegal.

Because Plaintiffs cannot satisfy either prong of the test for qualified immunity, their claim against Shiller based on an alleged illegal search of Lobato's bedroom must fail.

## 2.  The Shooting of Lobato

Again, Shiller did not enter the Residence until after the shooting of Lobato and therefore did not personally participate in the shooting or the search of the Residence that preceded it. Further, there is no evidence that Shiller knew or had any reason to know that Ford was likely to

employ deadly force against Lobato.  Under these circumstances, Shiller's liability for the use of

force against Lobato cannot be predicated on any alleged failure to intervene.  *See Ting v. United*

*States,* 927 F.2d 1504, 1511-12 (9th Cir. 1991) (non-shooting law enforcement agents could not

be held liable to plaintiff where there was no evidence that they knew that the shooting agent

would take such action and where the agents were physically incapable of preventing the

shooting). *See also Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1433 (10th Cir. 1984),

*vacated on other grounds,* 474 U.S. 805 (1985) (a police officer who does not prevent a fellow

officer's use of excessive force may be liable under Section 1983 only if he had the opportunity to

intervene but failed to do so).  Likewise, since Addison and Kyle had already assumed supervisory

responsibility for police operations at the Residence at the time of the shooting, Shiller's liability

for the shooting of Lobato cannot be predicated on his status as a supervising officer.  Shiller's

liability under Section 1983 must therefore again be predicated on the police functions that he

performed outside the Residence, but I must first determine whether Plaintiffs can show genuine

issues of material fact as to whether Lobato was subjected to excessive force.

Claims of excessive force must be analyzed under a standard of objective reasonableness.

*Graham v. Connor,* 490 U.S. 386, 388 (1989).  This standard requires a balancing of the

individual's Fourth Amendment rights against the countervailing governmental interests at stake

and requires careful attention to particular facts and circumstances, including the severity of the

crime at issue, the nature of the threat presented to the officers or others, and the degree of

resistance by the individual.  *Id.* at 396.

Consideration of these factors and the evidence submitted in connection with the summary

judgment motions establishes that there is clearly a triable issue as to whether Lobato was

subjected to excessive force in violation of his Fourth Amendment rights.  In particular, there are material disputes regarding precisely what transpired when the officers opened the door to Lobato's bedroom that preclude a determination at this stage that Ford's actions in shooting Lobato were objectively reasonable based on his purported belief that Lobato was armed and confrontational.  Among other things, there is a genuine dispute as to whether Lobato had any object in his hands, said anything, or made any movement when the door was opened.  Accordingly, I conclude that Plaintiffs have satisfied their burden of showing that, at a minimum, Ford may have violated Lobato's Fourth Amendment rights by utilizing excessive force against him.  The next question then is whether Shiller, who remained outside at the front of the Residence in a non-supervisory role, may also be held liable for this use of force.

As set forth previously, liability under Section 1983 can be predicated on conduct that sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to violate a constitutional right or on conduct that was integral to the violation of another's rights.  I must therefore determine whether Shiller's conduct in coordinating the police operations at the Residence for some period of time prior to officers' entry into the Residence satisfied these standards for Section 1983 liability with respect to the alleged unlawful shooting of Lobato.  Again, because the causal nexus between Shiller's conduct and the shooting of Lobato was necessarily broken, I conclude that it does not.  Although I need not address the second prong of the test for qualified immunity, out of an abundance of caution, I will assume for purposes of this Order that Shiller's conduct arguably caused Lobato to be subjected to excessive force in violation of  his Fourth Amendment rights and that he may therefore be liable to Plaintiffs for this use of force.

-17-

The next prong of the test for qualified immunity requires Plaintiffs to establish that the law imposing liability on a law enforcement officer such as Shiller was clearly established at the time such that a reasonable person in his position would have known that his conduct violated the law.  Once again, I recognized case law from the First and Fifth Circuits that could arguably support a conclusion that Shiller's conduct in relation to the shooting of Lobato may constitute a violation of Lobato's constitutional rights.  But once again, Plaintiffs have failed to establish that there is either Supreme Court authority, Tenth Circuit authority, or a weight of authority from other courts such that a reasonable person in Shiller's shoes would have known that his conduct in relation to the shooting of Lobato was illegal and therefore cannot satisfy the second prong of the test for qualified immunity.

Because Plaintiffs cannot satisfy either prong of the test for qualified immunity, their claim against Shiller based on an alleged use of excessive force against Lobato must fail.

### 3. The Handling of Lobato's body

Although Plaintiffs' response brief did not specifically address an alleged violation of Lobato's right to privacy by Shiller, other filings suggest that Plaintiffs are asserting a claim against him for such a violation.  Analysis of this claim based on these other summary judgment filings is therefore warranted.

Although not explicitly mentioned in the Constitution, the Supreme Court has repeatedly recognized that there is a constitutional right to privacy.  *See e.g. Carey v. Population Serv., Int'l,* 431 U.S. 678, 684 (1977).  Plaintiffs have alleged that Lobato's right to privacy was violated by Defendants' post-shooting conduct in failing to cover Lobato's nude body and in placing his nude body where it could be viewed by the public, as well as by Defendants' failure to intervene to

prevent the display of Lobato's nude body.

In support of their right to privacy claim, Plaintiffs have baldly asserted that a person's right not to have their unclothed body seized and placed in open view of the entire neighborhood is so fundamental and obvious that no supporting authority is necessary.  Indeed, Plaintiffs have cited but one Tenth Circuit case involving a right to privacy claim based on the viewing of a nude or semi-nude body.  Therein, the Tenth Circuit merely stated:

> Although the frequency of such practices is important, ... the plaintiff's statement that male inmates were subject to a "certain amount of viewing" by female guards does not necessarily fall short of a cognizable constitutional claim.  The district court thus erred in dismissing the entire action as frivolous.

*Cumby v. Meachum,* 684 F.2d 712, 714 (10th Cir. 1982) (*per curium*).

In the absence of any authority recognizing a violation of privacy right under facts even remotely similar to those present here, I conclude that Plaintiffs are unable to satisfy either prong of the test for qualified immunity and that their Section 1983 claim against Shiller based on alleged violations of Lobato's right to privacy must therefore fail.

## B.  Plaintiffs' Section 1985 Conspiracy Claims

Again, although Plaintiffs' response brief did not specifically address any Section 1985 conspiracy claim against Shiller, other filings suggest that Plaintiffs are asserting such claims against him.  Analysis of these claims based on these other summary judgment filings is therefore warranted.

Plaintiffs' responses to other summary judgment motions that have been filed in this case clarify that their claims under 42 U.S.C. § 1985 are predicated on three distinct alleged conspiracies: (1) Defendants' alleged agreement to engage in conduct in entering and searching

the Residence that was in reckless disregard or with deliberate indifference to Lobato's rights; (2)

Defendants' alleged agreement to cover-up the unlawful shooting of Lobato by manufacturing a

defense that Lobato was holding a shiny can in his hand when the officers opened the door to his

bedroom; and (3) Defendants' alleged agreement to display Lobato's nude body in public view.  I

conclude that Plaintiffs' claims against Shiller under Section 1985 must fail with respect to all of

these alleged conspiracies.

In order to prevail on a claim under Section 1985, Plaintiffs must prove the following

elements: "(1) a conspiracy; (2) the deprive plaintiff of equal protection or equal privileges and

immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting

therefrom."  *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993).  It is questionable at best

that the evidence, direct and circumstantial, viewed in the light most favorable to Plaintiffs shows

genuine issues of material fact as to the existence of any conspiracy.  But additionally, Plaintiffs

must prove that the alleged conspiracies were driven by racial or class-based discriminatory

animus.  *Id.*

To establish that the alleged conspiracies against Lobato and Plaintiffs were motivated by

racial or class-based animus, Plaintiffs have relied on the following facts: (1) Lobato was a

member of a minority group that has historically suffered from invidious discrimination; (2)

Defendants knew that Lobato and all other persons in the Residence were Chicano/Mexican-

Americans; and (3) the Denver Police Department's Early Identification and Intervention System

("EIIS") identified an excessive number of use of force incidents against minorities by Ford.  The

first two facts cited by Plaintiffs are insufficient in and of themselves to establish discriminatory

animus on the part of Defendants.  Thus, the EIIS reports must provide sufficient evidence of

such animus in order for Plaintiffs to defeat Shiller's motion for summary judgment on their Section 1985(3) conspiracy claims.

The EIIS reports do not relate in any way to Shiller.  Plaintiffs nonetheless assert that these reports are sufficient to establish the requisite discriminatory animus because they demonstrate an excessive number of use of force incidents against minorities by Ford, a co-conspirator.  A review of the related documents, however, fails to support this assertion.  Instead, these documents merely reflect that Ford was involved in a total of 3 use of force incidents against persons of all races during the applicable time period and was therefore automatically subject to review.  This evidence then does not support a conclusion that Ford was involved in an excessive number of use of force incidents against minorities.  Moreover, notably absent from the records relating to the use of force by Ford is evidence that any of these prior incidents involved people in the same ethnic minority or class as Plaintiffs or Lobato.  Under these circumstances, I conclude that Plaintiffs are unable to establish that the alleged conspiracies between Shiller and the other Defendants were driven by racial or class-based animus.  Plaintiffs' claims against Shiller under Section 1985 must therefore fail as a matter of law.

Although Shiller also argues that he is entitled to summary judgment on a claim for conspiracy under Section 1983, Plaintiffs have not made such a claim.  Rather, Plaintiffs merely cite authority regarding conspiracies under Section 1983 to support their conspiracy claim under Section 1985 but that implicates a different standard.

## C.  Plaintiffs' Claim for Deprivation of the Familial Right of Association

Plaintiffs have conceded that *Trujillo v. Board of County Comm'ers,* 768 F.2d 1186 (10th Cir. 1985), as the controlling law of the Tenth Circuit, precludes any claim for deprivation of the

familial right of association encompassed in either their Section 1983 or conspiracy claims.

**D.  Status of Discovery**

As a final note, Plaintiffs originally attempted to defeat Shiller's motion by arguing that they had not had an opportunity to complete discovery.  This, however, is no longer the case, and I have had the benefit of voluminous evidence obtained through discovery in making the findings and conclusions set forth in this Order.  I therefore conclude that summary judgment in favor of Shiller is appropriate at this time.

For the reasons set forth above, , IT IS ORDERED that

1.  Defendant Robert Shiller's Motion for Summary Judgment Based on Qualified Immunity  [Doc # 61] is GRANTED; and

2.  Plaintiffs' claims against Robert Shiller under 42 U.S.C. §§ 1983 & 1985 are hereby DISMISSED WITH PREJUDICE.


Dated: October   31  , 2007 in Denver, Colorado.

BY THE COURT:


  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE